# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
### SOUTH BEND DIVISION

| | | |
|---|---|---|
| WAYNE KUBSCH, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | CAUSE NO. 3:11CV42-PPS |
| | ) | |
| SUPERINTENDENT, | ) | |
| Indiana State Prison, | ) | DEATH PENALTY CASE |
| | ) | |
| Respondent. | ) | |

## OPINION AND ORDER

Petitioner Wayne Kubsch was sentenced to death following his conviction for the murders of his wife, his step-son, and his wife's ex-husband. The procedural history of the prosecution is complicated in that it involves two trials and two convictions of all three murders. After Kubsch was convicted and sentenced to death in the first trial in August 2000, the Indiana Supreme Court reversed and remanded for a new trial based on the improper admission into evidence of recordings of Kubsch's police interviews in which he invoked his right to silence. *Kubsch v. State* (*Kubsch I*), 784 N.E.2d 905 (Ind. 2003). In the second trial, Kubsch was again found guilty of all three murders.

The case against Kubsch was entirely circumstantial. There was no eyewitness, no DNA evidence, no fingerprint testimony, indeed no forensic evidence at all that linked Kubsch to the murders. There was, however, moderately strong evidence of motive and opportunity. But most damning to Kubsch was a series of lies, inexplicable omissions, and inconsistencies in what Kubsch told the police and later testified on the witness stand, and these statements – in conjunction with a few pieces of circumstantial evidence – are what almost assuredly got Kubsch convicted.

At sentencing, Kubsch fired his lawyers and proceeded *pro se*.  He told the jury that if they thought he did the heinous crimes for which he was convicted – and they obviously did since that was the verdict they just reached – then he deserved the death penalty.  Since there was no evidence presented to contradict the State's request for the death sentence, that is precisely what the jury recommended, and that is what the judge imposed in April of 2005.

Kubsch has unsuccessfully challenged his second conviction and sentence on direct appeal through the Indiana courts, and also by a petition for post-conviction relief.  *Kubsch v. State* (*Kubsch II*), 866 N.E.2d 726 (Ind. 2007); *Kubsch v. State* (*Kubsch III*), 934 N.E.2d 1138 (Ind. 2010).  Now before me is Kubsch's petition for a writ of habeas corpus, filed pursuant to 28 U.S.C. §2254.

The facts as detailed below principally come from the state court opinions and will provide an overview of the factual background of this depressing case.  The facts specific to any particular claim are discussed in more detail in the section of the opinion addressing that claim.  One other caveat: because much of the analysis in this opinion involves a determination of whether certain trial errors prejudiced Kubsch, and because in an entirely circumstantial case like this one it is difficult to determine prejudice unless one endeavors to read the entirety of the trial transcript, that is what I have done. As a result, some of the facts detailed below come directly from that trial transcript. And as one might expect, the facts are exceedingly grim.

**Factual Background**

Wayne Kubsch and his wife Beth lived in Mishawaka, Indiana with Beth's 12-year-old son, Anthony Earley.  Beth also had an 11-year-old son, Aaron Milewski, but Aaron lived in South Bend (the next town over) with his dad, Rick Milewski. Rick is Beth's ex-husband. Friday, September 18, 1998, was Beth Kubsch's birthday.  Anthony attended an after-school dance that day, and Beth was scheduled to pick him up at 4:45 p.m.  Because Beth failed to appear at the school, Anthony got a ride home with a friend; he arrived home about 5:30 and saw two cars in the driveway.  One was Beth's and the other Rick's.  Inside, it appeared that no one was home, but Anthony saw signs of a struggle and blood on the floor of his mother's bedroom. Checking the basement, Anthony found a horror scene.  Lying there were the bodies of his former step-dad, Rick, and his step-brother, Aaron.  Rick had a knife protruding from his chest. Autopsy results later indicated that both Aaron and Rick had been shot in the head;  Aaron had been stabbed 22 times.  Anthony ran to a neighbor's home, and the police were called.

Arriving on the scene at approximately 5:45, the Mishawaka Police Department cordoned off the house with crime scene tape.  Beth's whereabouts were as yet unknown.  Wayne Kubsch arrived home at approximately 6:45, and after being told what had been found, had to be restrained from entering the house.  Wayne was escorted to the Special Crimes Unit in South Bend for questioning by detectives Wayne Samp and Mark Reihl.  The interview was recorded by both video and audio, and was completed before 9:00 p.m. when Kubsch put a halt to the questioning and left the police station.

A short while later, investigators at the house notified the detectives that evidence technicians had found Beth's body.  She too was found in the basement but she was secreted in a

"fort" Anthony had constructed under the stairs using old blankets. Beth was "hog-tied" with duct tape, her head was bound in tape and she had been stabbed 11 times. Officers were sent to pick Kubsch back up and bring him back to the Special Crimes Unit for further questioning. Again the interview was both videotaped and audio-recorded. Kubsch refused to talk but he did sign a consent to search his vehicle.

The jury heard testimony from Wayne's friend Dave Nichols and his then-girlfriend (later wife) Gina DiDonato concerning a phone call from Wayne on the night of the murders. According to Dave's and Gina's testimony, Wayne indicated to each of them that Beth was "gone" by which they took him to mean that she was dead. This could have been viewed as incriminating by the jury because Kubsch had not yet been notified by the police that Beth's body had been found under the basement stairs at the time he told this to Nichols and DiDonato. [2005 Trial Tr. at 2456-57, 2923-24, 2934].[1]

Kubsch also told Dave Nichols that Rick and Aaron had been shot and stabbed. [Tr. at 2456]. This was highly incriminating because the fact that the two had been shot was not discovered until their autopsies the next day. [Tr. at 1568.] The State argued that Kubsch could not have known this important detail unless he was present when the fatal shots were fired.

Blood specimens were obtained from numerous locations throughout the Kubsch house in the master bedroom, hallway, dining room, basement stairway and basement. Although there were indications of a struggle between Beth and her attacker, all the specimens matched the

---

[1] Most trial record citations will be to the 2005 trial. Citations to the transcripts of the 2001 trial and the post-conviction evidentiary hearing will be so indicated.

victims.  A "presumptive test" for blood in the drain of the Kubsches' shower could not be confirmed by DNA testing due to the inadequate amount of the sample.

Kubsch had a significant motive for killing Beth.  A $575,000 life insurance policy recently obtained on Beth would get him out of the financial hole he was in. The financial picture was bleak.  Kubsch had in recent years purchased a number of rental real estate properties, and owned 11 such properties in St. Joseph County.  All of the properties had substantial mortgages on them.  In addition, Kubsch had run up substantial credit card debt. In the Spring of 1998 Wayne refinanced a number of the rental properties in order to pay off credit card debt in excess of $16,000.   The refinancing involved closing costs of almost $25,000 and increased Wayne's mortgage debt to more than $426,000.  [Tr. at 2800.]  By August 1998, Kubsch had accumulated another $23,000 in credit card debt through purchases and cash advances, was falling behind on some of his mortgages, and was dangerously delinquent on the real property taxes on his rental properties. [Tr. at 2799, 2802.]

As noted, in July 1998 Kubsch obtained a new life insurance policy on Beth, in the amount of $575,000.  At that time, Kubsch already had a $350,000 policy on his own life. [Tr. at 2725.]  Kubsch met with his insurance agent about increasing the policy coverage. [*Id*.] Kubsch testified that he applied to increase his own coverage but ultimately chose not to because the premium was too high. [Tr. at 2726.] Kubsch repeatedly claimed that he was unaware of their bleak financial situation. [Tr. at 2727, 2734, 2735, 2796, 2798, 2800-01, 2802-03, 2818.]  But this was difficult to square with the fact that he took care of the couple's bills, he dealt with the credit cards and lines of credit, and he was obviously aware enough of the financial scenario to have engaged in all the refinancing earlier in the year. [Tr. at 2736, 2794, 2796, 2798, 2799.]

5

In addition to the coincidental procurement of the life insurance coverage and the obvious and significant financial motive, Kubsch's guilt was established by the slow-moving accumulation of a glacier of circumstantial evidence. Although particular items of evidence would be of little value considered in isolation, the sheer number of small indications consistent with Kubsch's guilt added up, and the glue that held that mosaic together came from Kubsch himself – from contradictions in and inexplicable omissions from his statements to the police and his courtroom testimony.

One piece of incriminating evidence related to the duct tape that was wrapped around Beth's head and was used to hog-tie her; a roll of tape was found at the top of the basement stairs in the house and it matched the end of the tape that was wrapped around Beth. [Tr. at 1806, 1809.] Packaging from that type of duct tape was recovered from Kubsch's car. [Tr. at 1807.] Fibers matching carpet fibers from Wayne's car were found on the roll of duct tape. [Tr. at 1794-95.] A receipt was found in Wayne's car showing the purchase of duct tape three days before the murders on September 15. [Tr. at 1622.] Kubsch's car also contained the tags from a pair of full-face ski masks that were never found. [Tr. at 1620.]

Several witnesses testified that the sunglasses found by Beth's body in the basement were of a kind commonly worn by Kubsch. Witnesses who recognized them as a kind Kubsch wore included Suzanne Hiatt (Beth's sister) who said she was "100% sure" that the sunglasses belonged to Kubsch. [Tr. at 2388.] Brad Hardy testified similarly. [Tr. at 2122.][2]

_____

[2] It is true that other witnesses – Wayne's ex-wife Tina Cothard [Tr. at 2632] and friend Dave Nichols [Tr. at 2468] – testified that the sunglasses didn't look like any they'd seen Wayne wear.

The State's theory of the case was that Kubsch killed his wife for the insurance money and that while he was in the process of doing this, the other two victims (Aaron and Rick) happened upon the scene. The State thus theorized that Kubsch killed Aaron and Rick to eliminate them as witnesses. There was no forced entry into the Kubsches' home. The house was locked when Anthony arrived in the afternoon, meaning that whoever committed the murders locked the doors on the way out. Only Wayne, Beth and Anthony had keys. There was forced entry into the master bedroom, where the evidence suggested Beth had retreated after being bloodied by an assault in the living room/dining room area, where the evidence indicated that she was bashed in the head with a sauce pan from the kitchen. [Tr. at 1596, 1896, 1961.] The prosecution argued that a stranger would likely have fled after assaulting Beth, rather than force his way into the bedroom to continue the attack, later stabbing and binding Beth after moving her to the basement, and then also stay to attack and murder Rick and Aaron.

The prosecution also argued that an intruder could be expected to leave a mess of trailed footprints as he hurriedly exited the house across the bloody scene, but there were none. [Tr. at 1638-39.] The home telephone's handset and the master bedroom television were gone, but visible cash was left lying on top of a dresser. [Tr. at 1306.] The prosecution argued that items taken were a clumsy attempt to make the crime look like a home invasion burglary gone wrong.

When he arrived at his home that evening, Wayne smelled fresh and clean [Tr. at 1362] although he claimed to have been wearing the same clothes he'd worn all day in the un-air-conditioned sawdust-filled cabinet shop from which the workers usually emerged sweaty and dirty after a day's work. [Tr. at 2765-66, 2018-20.] Neighbor Erin Honold testified to seeing Wayne arrive at home before noon and get out of his Tracker, wearing clothes different from

those he said he'd worn that day. [Tr. at 2429-2431.] Erin described turquoise shorts, some of which were recovered at the house in the aftermath of the murders, found on a chaise-lounge on the Kubsches' porch. [Tr. at 1605, 1608, 1631.]  Honold testified that Wayne spent a little while moving things around in the garage, then came back to his car on the driveway and looked back and forth down the street in both directions before going back into the garage and entering the house by the service door. [Tr. at 2432.]

Wayne's videotaped interview with the police the night of the murders was played for the jury.  As noted above, at the time of the first interview, the bodies of Rick and Aaron had been found in the Kubsches' basement, but the police had not yet discovered Beth's body under the basement stairs and her whereabouts were unknown.  In the videotape, Wayne appears preoccupied and careful, not distraught or frantic.  He made no reference to the search for his missing wife, much less displayed any hurry or urgency.  (Kubsch was unaware of the camera recording him). Throughout the interview, he showed no emotion by his expression or voice, but sat with his head down and his face hidden by his hands, not looking at the officer.

Another fact that the prosecution pointed to was Kubsch's attempts to account for his behavior at lunchtime on the day of the murders.  He and Beth had planned to meet for lunch to celebrate her birthday, but Wayne told her that morning that he didn't think he'd be able to meet because he had been late for work. [Tr. at 2749.] But Kubsch acknowledged going home on his lunch hour, and that he did so after receiving permission to leave early so as to buy Beth a birthday present. [Tr. at 3102, 3106.]  Kubsch did leave 40 minutes early to take the extended lunch period he'd been granted [Tr. at 2694, 2748], though instead of meeting Beth for lunch **or** buying her a birthday present, he drove home, a greater distance from his workplace than the

8

restaurant where they'd planned to meet. [Tr. at 2747-48.] Kubsch never explained why he let the birthday lunch plans fall through and went home instead. [Tr. at 2749-50.]  He said the purpose was to surprise Beth and spend a little time with her, even though they wouldn't have time to go out for lunch. [Tr. at 2816-7.]  But the prosecution claimed that this made no sense because they would have had the same amount of time for lunch as they had earlier planned on, and because Kubsch wasn't sure that Beth would be at home; in fact, in his original statement to police, he said that he called home on his way and Beth wasn't there.

The night of the murders, when Kubsch was asked to account for his entire day, he told the police he couldn't get into the house when he came home at lunchtime because he didn't have his keys. [Tr. at 2695, 2742-43, 2744.] At trial he changed his story; he said he did go into the house. By that time, Kubsch knew the police were aware he'd gone inside, because he had returned a phone call to a finance company representative who had left a message that morning. [Tr. at 2698, 2179, 2181-2.] The home telephone records showed the call at 11:37. [Tr. at 2699.] In addition, the police found a receipt in Kubsch's car from Beth's visit to her credit union that morning, which he must have gotten by picking it up inside the house.  Trying to explain his failure to provide the information earlier, Kubsch testified that he figured the police knew from his indication that he'd gone into the garage that he was then able to get into the house itself through the door that joined them. [Tr. at 2744.]  But his responses the night of the murders clearly indicated that he couldn't and didn't get into the house.  So in essence, the prosecution argued that Kubsch conformed his story at trial to the evidence.

Another change in Kubsch's account of his day occurred with respect to his whereabouts after work, obviously an even more critical period of time with respect to the murders.  Kubsch

9

told the police on the night of the murders that he headed straight to Michigan after work and did not go home. [Tr. at 2746.]  But at trial, he testified that he did return home for a moment.  This admission came only after Kubsch found out that the police had obtained cell phone tower records indicating that Kubsch made 14 calls in his local calling area between 1:53 and 3:18 p.m, and one of the calls placed him right near his house at 2:51 pm.  In other words, he couldn't have gone straight to Michigan after work, as he led the police to believe in his interview on the night of the murders.

During his interview with the police Kubsch did not offer any concrete information that he had about Beth's whereabouts the day of the murders, such as that she had visited her credit union at the time indicated on the receipt Wayne had in his car.  He spoke only generally as to what Beth "usually" did after getting off work on a payday Friday, but he did not outline what the evidence showed Kubsch knew she actually did that day – going to the credit union with her paycheck and visiting the credit counseling agency to make a payment.  In addition, Kubsch testified at trial that during a phone conversation with Beth at 1:15 or 1:30 she told him that she was going out to get something to provide as a snack for the field trip she and Aaron were going on the next day. [Tr. at 2791-92.] But Kubsch never told the police this information on the night of the murders, even though his wife was missing under very ominous circumstances.  [Tr. at 2792.] The State thus argued that Kubsch did nothing to assist the police with reconstructing his wife's movements and whereabouts on the day of the murders.

An additional mismatch in Kubsch's stories occurred in conversations with his mother-in-law.  Beth's mother, Diane Rasor, testified that when she talked to Kubsch on the afternoon of the murders, she mentioned to Kubsch that she hadn't been able to get in touch with Beth that

10

day. [Tr. at 2348-49.] Kubsch reassured her, telling her that he knew from his telephone calls with Beth during the day that she was running a number of errands and thus was not at home to answer the phone. [Tr. at 2350.] Yet several days later Kubsch told Rasor that he didn't talk to Beth the day she was killed and he wished that he had. [Tr. at 2350-51.]

In the end, the State argued, and the jury accepted, that Kubsch's many misstatements and odd omissions were actually attempts at misdirection. This, in combination with the incriminating circumstantial evidence, led to his conviction on three counts of murder. After exhausting all of his state remedies, Kubsch now seeks habeas relief.

## Federal Habeas Corpus Standards

When a state prisoner challenges his confinement via habeas corpus, the petition may be granted only where a state court's handling of the case "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court" or "was based on an unreasonable determination of the facts in light of the evidence presented." 28 U.S.C. §2254(d); *see also Griffin v. Pierce*, 622 F.3d 831, 841 (7th Cir. 2010).

A state court's decision is "contrary to" clearly established federal law when the court applies a rule in a way that contradicts the law as set forth by the Supreme Court or when the state court reaches a different result from a Supreme Court decision on facts materially indistinguishable from the Supreme Court case. *Badelle v. Correll*, 452 F.3d 648, 654 (7th Cir. 2006). On the "unreasonable application" prong, a state court unreasonably applies federal law if it identifies the correct legal principle but unreasonably applies it to the facts of the case. *Williams v. Taylor*, 529 U.S. 362, 407 (2000); *Goudy v. Basinger*, 604 F.3d 394, 399 (7th Cir. 2010). Unreasonable application of federal law for §2254(d) purposes is "not just incorrect, but

11

also unreasonable, 'that is, lying well outside the boundaries of permissible differences of opinion.'" *Goudy*, 604 F.3d 399 (quoting *Toliver v. McCaughtry*, 539 F.3d 766, 774 (7th Cir. 2008)).

Kubsch raises seven issues in his habeas petition, with one of those issues – ineffective assistance of counsel – having eleven subparts.  I will address each issue below in the order in which Kubsch presented them to me in his petition.

**Claim I – 5th Amendment Right to Remain Silent**

The parties disagree about the nature of Kubsch's Claim I, or at least the correct way to analyze it.  Kubsch contends that it is a claim governed by the Fifth Amendment and *Miranda*. The State says it is a straight-forward Fourth Amendment issue dressed up to look like a Fifth Amendment claim.  As Kubsch puts it, his "rights under the Fifth Amendment were violated when the police re-initiated questioning of him after he asserted his right to remain silent," in violation of *Miranda v. Arizona*, 384 U.S. 436 (1966) and *Michigan v. Mosley*, 423 U.S. 96, 104 (1975).  [DE 16 at 16.]  Kubsch goes on to assert that the "resulting search of [his] car was the fruit of this illegal interrogation."  *Id*.  Unfortunately, for Kubsch, whether his claim is analyzed under the Fourth Amendment or under the Fifth Amendment, he loses either way. I will take up the Fifth Amendment issue first.

The Fifth Amendment guarantees that no person "shall be compelled in any criminal case to be a witness against himself."  U.S. Const. amend. V.  That privilege against self-incrimination guarantees a person under custodial interrogation "the right 'to remain silent unless he chooses to speak in the unfettered exercise of his own will.'" *Miranda*, 384 U.S. at 460 (quoting *Mallow v. Hogan*, 378 U.S. 1, 8 (1964)).

Because Claim I is ultimately about the consent to search Kubsch's car as opposed to any other statement obtained from Kubsch during interrogation, the State cites *United States v. McClellan*, and other cases like it, in which the Seventh Circuit reaffirmed that "a request for 'consent to search is not interrogation within the meaning of *Miranda*,' because the giving of such consent is not a self-incriminating statement." *United States v. McClellan*, 165 F.3d 535, 544 (7th Cir. 1999) (quoting *United States v. Shlater*, 85 F.3d 1251, 1256 (7th Cir. 1996)); *see also United States v. Smith*, 3 F.3d 1088, 1098 (7th Cir. 1993). So even if the conduct of the agents leading up to the request for consent amounted to custodial interrogation for *Miranda* purposes, the Seventh Circuit has said that "the request for consent to search can be properly separated from whatever illegal interrogation that might have preceded it, thereby making the consent constitutionally valid." *McClellan*, 165 F.3d at 544.

In any event, Kubsch was not "in custody" for *Miranda* purposes when he signed the consent to search. As the Indiana Supreme Court succinctly noted: "[N]o reasonable person in Kubsch's position would have believed that he was under arrest. Not only did he have reason to believe he could leave, he was unrestrained and actually did leave, after both the first and second interview." *Kubsch I*, 784 N.E.2d at 917.

The facts support the Indiana Supreme Court's conclusion. Kubsch had been interviewed earlier in the evening when the police were aware of only two bodies in the home, those of Rick and Aaron. Kubsch had been told then that he was not under arrest but he had been given the *Miranda* warnings anyway. After Kubsch indicated that he did not want to talk with the officers anymore but wanted to talk to his wife's mother, he left the interview room and ultimately the police station. Later, after the police discovered Beth's body, an officer was sent to find Kubsch.

13

This was the same officer who had driven Kubsch to the police station from the crime scene, Sergeant Ravotto.  Ravotto pulled up next to Kubsch as he was walking down the street, rolled down the squad car's window and asked Kubsch if he could get back in and go back to the police station.

No restraint or force was used.  Kubsch opened the door himself and got back in the squad car's backseat, where he had ridden earlier.  Back at the station, Kubsch was left unguarded in a lobby for a few minutes before he was shown to an interview room.  The same investigators as before – Captain Samp and Sergeant Reihl – talked to Kubsch again.  Kubsch told them he did not want to answer questions. Reihl then asked Kubsch for permission to search his 1994 Geo Tracker.  Kubsch immediately agreed and signed the consent to search form after it was reviewed with him by Samp.  Afterward, in short order, Captain Samp told Kubsch that Beth was dead, Kubsch reiterated that he didn't want to answer any more questions and for the first time added that he didn't want to talk without an attorney.  No further questioning occurred (other than clarification as to the Tracker's keys) and Kubsch was free to go.

On these facts, the Indiana Supreme Court's conclusion is unassailable that Kubsch was unrestrained and had no reason to believe he could not leave.  Kubsch's best arrow is the weak one that he rode in the backseat of the squad car which did not allow him to open the doors from the inside.  But when he voluntarily got into the squad car and was left alone in the station lobby after leaving the squad car, it is clear that he was not being held or restrained.  So even if *Miranda* could come into play with respect to a request for consent to search, its holding is not applicable here where Kubsch was not subject to a custodial interrogation.  There is nothing

14

unreasonable about the Indiana Supreme Court's application of *Miranda's* custody requirement that would mandate the issuance of a writ of habeas corpus.  *See* 28 U.S.C. § 2254(d).

Kubsch fares no better if the issue is construed as a Fourth Amendment claim because any such claim is barred by *Stone v. Powell*, 428 U.S. 465 (1976).  *Stone* holds that "where the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, a state prisoner may not be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial."  *Id.* at 494.  Kubsch responds by invoking *Withrow v. Williams*, 507 U.S. 680, 683 (1993), in which the Supreme Court held that "*Stone*'s restriction on the exercise of federal habeas jurisdiction does not extend to a state prisoner's claim that his conviction rests on statements obtained in violation of the safeguards mandated by *Miranda*."  Here, the gist of Kubsch's Claim I is not any incriminating statement obtained from him, but the consent to search, which as demonstrated above is not itself a "statement" for purposes of *Miranda* analysis.  Ultimately, then, as is clear from Kubsch's briefing, Claim I rests on the assertion that the incriminating fruits of the tainted search were used against him at trial to obtain his conviction.  But *Stone* held that "federal habeas review is not available to a state prisoner alleging that his conviction rests on evidence obtained through an unconstitutional search or seizure" where the Fourth Amendment claim was fully and fairly litigated in the state courts, as it was here.  *Withrow*, 507 U.S. at 682-83.

In sum, neither Fourth Amendment principles nor Fifth Amendment principles entitle Kubsch to relief on Claim I of his petition.

**<u>Claim II – Due Process & Conflict of Interest Regarding Prosecutor Dvorak</u>**

Brad Hardy was a friend of Wayne Kubsch's who came forward two days after the murders to tell police that at lunchtime on the day of the murders he accompanied Kubsch to his home, where Hardy sneaked through the woods behind the house to see if Beth was home, ostensibly because Wayne wanted to decorate the house for Beth's birthday that day.  Hardy also reported that later in the afternoon, Kubsch stopped by Hardy's house briefly to ask Hardy if he wanted to go to dinner with the Kubsches.  Hardy further told police that the day after the murders, Wayne asked Hardy not to reveal to the police that he had been with Kubsch on the day of the murders.  Several weeks later, three credit cards of Beth's were found in woods near Hardy's home.

Hardy's deposition was taken on April 11, 2000, at which time he appeared with attorney Michael Dvorak acting as his counsel.  In May 2000, Hardy was charged with Conspiracy to Commit Murder and Assisting a Criminal, charges arising out of the murder of Beth Kubsch.  Hardy testified in Kubsch's first trial on June 8, 2000.  Two years later, the charges against Hardy were voluntarily dismissed by the State on May 6, 2002.

On September 30, 2003, after Kubsch's first appeal resulted in a remand for a new trial, he filed a motion for the appointment of a special prosecutor because Hardy's lawyer, Michael Dvorak, had been elected prosecutor of St. Joseph County in November 2002 and was sworn into office in January 2003.  The motion for a special prosecutor was denied, and Kubsch now claims that his due process rights were violated because his case was prosecuted by Dvorak who Kubsch claims had a conflict of interest.

16

The State argues that federal habeas review is barred because on direct appeal the Indiana Supreme Court disposed of this claim on an adequate and independent state ground, namely waiver of the claim. But the opinion doesn't invoke any such doctrine, much less "clearly and expressly." *Pole v. Randolph*, 570 F.3d 922, 937 (7th Cir. 2009); *see also Harrison v. McBride*, 428 F.3d 652, 664 (7th Cir. 2005) ("that an express finding of waiver is not present dooms this argument"). Instead the Indiana Supreme Court acknowledged but dismissed the federal due process claim that Kubsch was denied trial at the hands of a disinterested prosecutor, finding that Kubsch failed to make "convincing arguments regarding his due process claims." *Kubsch II*, 866 N.E.2d at 734 and n.6. This was a rejection of the claim on the merits, not based on waiver. The United States Supreme Court held that "[w]hen a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." *Harrington v. Richter*, 131 S.Ct. 770, 784-85 (2011). So the Indiana Supreme Court's denial of Kubsch's federal claim is now subject to the deferential standard of review found in §2254(d).

Under §2254(d)(1), relief is available only if the Indiana Supreme Court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." In his opening brief, Kubsch makes no attempt to identify controlling federal principles governing his conflict of interest claim. The State says that is because no such clearly established federal law exists. [DE 22 at 14.][3] In his

---

[3] Citations to the record are to the page number assigned by ECF rather than to any internal page number within the document.

traverse, Kubsch points to *Young v. United States*, 481 U.S. 787 (1987), as the "clearly established federal law on this point," and argues that the standard is whether, because of duties arising from his prior representation of Hardy, Dvorak had a "personal interest in the outcome of the litigation." [DE 26 at 19.]

In *Young*, the Supreme Court held that "counsel for a party that is the beneficiary of a court order may not be appointed to undertake contempt prosecutions for alleged violations of that order." 481 U.S. at 790. The lengthy discussion examines the "requirement of a disinterested prosecutor," and relies largely on case law applying federal constitutional principles. *Id.* at 807-12. But because the matter arose in federal court and concerned review of the propriety of a federal district court's appointment of a particular attorney to prosecute a contempt, the majority opinion made it clear that it was "rely[ing] on our supervisory authority [over the lower federal courts] to avoid the necessity of reaching any constitutional issues." *Id.* at 810, n. 21. As a result, *Young* did not establish any *constitutional* standards that have application to Kubsch's prosecution in the state courts of Indiana. The Indiana Supreme Court's rejection of Kubsch's due process claim based on *Young* was therefore not an unreasonable application of any clearly established federal law as determined by the U.S. Supreme Court, and under §2254(d) this federal court can't grant relief on the claim.

But even if I attempted to apply the "personal interest" standard that Kubsch extracts from *Young*, Kubsch does not succeed. Without clearly identifying Dvorak's conflicting "personal interest" in the outcome of the litigation, Kubsch's argument flounders from one notion to another in an attempt to demonstrate a conflict of interest between Dvorak's "duties to his former client Hardy and his present client, the State" that had a detrimental impact on

18

Kubsch. [DE 26 at 19.]  Kubsch does not attempt to show that Dvorak received any confidential information from Hardy and later used it without Hardy's consent to assist the prosecution of Kubsch.  At the hearing on the motion for appointment of a special prosecutor, Hardy waived his attorney/client privilege as to the question in a colloquy with the court, and the testimony of both Dvorak and Hardy was that Hardy had confided nothing to Dvorak that was additional to or different from his many statements in the public record.  Hearing Transcript of 10-31-03 at 47, $\ell\ell$.9-11; at 48, $\ell\ell$. 5-15. The state court judge who denied the motion for appointment of a special prosecutor credited this testimony, noting that no other evidence or testimony was offered to contradict it.  *Id*. at 82, $\ell\ell$. 14-23.

Defense counsel appeared to concede that there would be no actual conflict unless Hardy was called in the second trial and offered different testimony predicated on confidential information previously known by Dvorak (but presumably not remembered by him at the time of the motion hearing).  *Id.* at 65, $\ell\ell$.10-19.  But that never happened.

So Kubsch is left to argue that Dvorak's conflict made him less amenable to plea negotiations.  The suggestion is that to negotiate with Kubsch would have been adverse to the interests of Hardy, but how and why that would have been so is entirely unclear.  By the time Dvorak took office, the charges against Hardy had been dismissed, based on the conclusion of the former prosecutor that "the facts do not warrant prosecution."  Hearing of Oct. 31, 2003, State's Exh. 3.  Morever, Kubsch never expressed any interest in accepting a plea agreement and there is no suggestion (or evidentiary support for a suggestion) that Kubsch ever had a change of heart on this issue.  Transcript of Oct. 31, 2003 Hearing at 60, $\ell\ell$.12-14; at 69, $\ell\ell$.7-10.  Kubsch is unable to demonstrate that Dvorak had any personal interest that impaired potential plea

19

negotiations, and as the Indiana Supreme Court observed, "one cannot be unfairly denied something that he did not want." *Kubsch II*, 866 N.E.2d at 733-34.

Kubsch offers the observation that if "Dvorak were to seek out Kubsch's cooperation to supply information against Hardy he would...violate his ethical obligations owed to his former client." [DE 26 at 22.] This is true as far as it goes, but there is no indication that such cooperation was warranted by the investigation. As mentioned, the charges against Hardy had been dismissed for lack of factual support eight months prior to Dvorak taking office. Kubsch offers no basis for an obligation to re-open the closed investigation of Hardy with respect to the crimes for which Kubsch had already been convicted once. This angle of attack does not support a conclusion that Dvorak had a personal interest that interfered with the exercise of his prosecutorial authority or discretion in a way that unfairly disadvantaged Kubsch.

Kubsch also points to the grant of use immunity to Hardy for his trial testimony. But the immunity was granted in the first trial by the prosecutor who preceded Dvorak. When the exercise was repeated in the second trial, the record reflects several times (without dispute by Kubsch's counsel) that Hardy had "never changed his story" throughout his multiple videotaped interviews with police, his deposition testimony and his trial testimony. [Tr. at 2169, 2172, 2236, 2238.] That Dvorak had previously represented Hardy is not shown to have played any role or made any difference in either the grant of use immunity or in Hardy's testimony compared to the first trial.

To sum up: perhaps it would have been prudent for Dvorak to step aside and ask for the appointment of a special prosecutor. But Kubsch has failed to show that lingering duties of Dvorak to Hardy played a role in any prosecutorial decision against Kubsch. And more to the

point, he is unable to demonstrate that any federal law clearly established by the U.S. Supreme Court was misapplied by the Indiana Supreme Court when it denied the claim relating to Dvorak's alleged conflict.  Claim II is therefore denied.

## Claim III – *Brady* Violation

Prosecutors have a constitutional obligation to disclose exculpatory evidence to the defense.  *Brady v. Maryland*, 373 U.S. 83 (1963).  This includes favorable evidence material to either guilt or punishment, including impeachment evidence.  *United States v. Villasenor*, 664 F.3d 673, 683 (7th Cir. 2011); *United States v. Wilson*, 481 F.3d 475, 480 (7th Cir. 2007). Kubsch contends that the Indiana courts improperly rejected his *Brady* claim based on information the prosecutor had from Hardy's defense lawyer, that was not turned over to Kubsch.  Kubsch now claims that this violation of *Brady* entitles him to habeas corpus relief.

The supposedly exculpatory evidence that Kubsch now claims was kept from him was a letter that Brad Hardy's lawyer, Mike Dvorak, had sent to the prosecutor after the first trial.  (As discussed above, Dvorak was later elected prosecutor of St. Joseph's County and was in office during Kubsch's second trial).  Here is how the issue developed: during the PCR proceedings, Kubsch learned that Mr. Dvorak had sent a letter to the prosecutor in June of 2000 after Kubsch's first trial, informing him of two pieces of information that Dvorak had received from Hardy.  First, Dvorak disclosed that Hardy remembered that a day or two prior to the murders he and Darin Polachek were playing basketball in Kubsch's driveway.  The potential significance of this is that Polachek drove a brown and tan sedan and a witness at the first trial (Kathy Kruszewski) said that she saw a dark sedan speeding down the street where the Kubsch house was located on the afternoon of the murders.  Second, Dvorak disclosed in his letter that Hardy

21

had been in a car accident a few years before the murders and had filed a civil lawsuit relating to

that accident.  According to Dvorak's letter, Hardy received a substantial settlement from the

lawsuit and a portion of the settlement proceeds was compensation for diminished mental

capacity resulting from the accident.  Neither of these bits of information was shared with

Kubsch's lawyers prior to trial.  As mentioned, it only came to light during the PCR proceedings

after Kubsch was convicted at his second trial.

In his opening brief, Kubsch argued that AEDPA applied and that the Indiana courts'

decision was contrary to or involved an unreasonable application of Supreme Court authority, or

was based on an unreasonable determination of the facts.  But in his traverse, Kubsch reversed

course and he now claims that the AEDPA standard does not apply because the Indiana Supreme

Court failed to fully adjudicate his *Brady* claim.  Kubsch argues that the Indiana Supreme Court

treated the claim as one based on newly discovered evidence under state law, and failed to fully

consider the matter under the standards of *Brady*.  According to Kubsch this means that I am not

constrained by the deferential standard of §2254(d) in reviewing the issue.  Because this

argument was not made in the opening brief, the State has not had an opportunity to respond to it

in writing.

In *Harrington v. Richter*, 131 S.Ct. 770 (2011), the Supreme Court held that deference is

due to a state court's determination of an issue under § 2254(d)(1) even where "the state court

relief is denied without an accompanying statement of reasons."   *Id.* at 780.  In other words, the

Court  "endorsed a presumption that such a resolution was on the merits unless 'there is reason

to think some other explanation for the state court's decision is more likely.'" *Brady v. Pfister*,

711 F.3d 818, 825 (7th Cir. 2013) (quoting *Richter*, 131 S.Ct. at 785)). Then earlier this year, the

Supreme Court said that merely mentioning a federal claim "in passing in a footnote" may be enough to rebut the presumption that a state court adjudicated an issue on the merits and thus could lead to *de novo* review as opposed to review based on AEDPA deference. *Johnson v. Williams*, 133 S.Ct. 1088, 1096 (2013); *see also Brady,* 711 F.3d at 825.

That raises a concern in this case because in the appeal from the denial of his PCR, the Indiana Supreme Court initially identified the claim as one under *Brady*. *Kubsch III*, 934 N.E.2d at 1145. But shortly thereafter the Court indicated that it believed that Kubsch intended to raise the matter as a claim of newly discovered evidence. *Id.* The Court then set out the standards for a *Brady* claim but relegated the discussion to a footnote, *id.* at n. 4, thus raising the question of whether this is enough to rebut the presumption established in *Richter* that a state court decided the issue on the merits. *See Johnson*, 133 S.Ct. at 1096.

After thoroughly considering the matter, I find that Kubsch fails to rebut the presumption that the Indiana Supreme Court adjudicated the *Brady* issue on the merits because, ultimately, it rejected both the state law claim of newly discovered evidence and the federal *Brady* claim on the basis of a common consideration between the two analyses, namely materiality. *Kubsch III*, 934 N.E.2d at 1145. I am not persuaded that the Indiana Supreme Court's analysis entirely shortchanged the dimensions of the federal *Brady* claim, so as to render AEDPA deference inapplicable. The Indiana Supreme Court identified the claim as one under *Brady*, set out the *Brady* standards, albeit in a footnote, and after examining the evidence stated its conclusion that "the *Brady* claim also must fail." *Kubsch III*, 934 N.E.2d at 1146. The extent to which the analysis was commingled with a state law issue does not constitute a failure to address the federal claim.

On the crucial element of materiality, the Indiana Supreme Court stated and applied the federal standard, quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985): "Evidence is material [under *Brady*] 'only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A "reasonable probability" is a probability sufficient to undermine confidence in the outcome.'" *Kubsch III*, 934 N.E.2d at 1145, n.4. The Indiana Supreme Court's reasoning wasn't contrary to or an unreasonable application of federal law because both pieces of evidence would have been of negligible value to the defense.

First, as the thorough PCR opinion observed, the facts revealed in Dvorak's letter – i.e., the information about Darin Polachek's car and Brad Hardy's head injury – were likely already known to Kubsch himself. [DE 16-1 at 78.] The Polachek information offered in Dvorak's letter was based on a gathering at Kubsch's own house just days before the murders, to which Polachek had driven his 1978 tan-over-brown Oldsmobile. As for the information about Hardy's car accident, he and Kubsch had been friends since school days, including the time period during which Hardy's accident occurred. Hearing of Oct. 31, 2003, State's Exh. 5 at 2. It is highly unlikely that Kubsch was unaware of Hardy's accident and any cognitive problems it was alleged to have caused him.

More substantively, neither piece of information could reasonably be said to create a probability of a different result in Kubsch's trial. Kubsch grossly overstates the value of the Polachek "lead" when he repeatedly characterizes it as "implicating" Polachek in the murders. [DE 16 at 24; DE 26 at 27.] At best, it might have led to a suggestion that Polachek was seen

24

driving recklessly down Kubsch's street on the afternoon of the murders – but even that strikes me as a stretch.

At Kubsch's first trial, the defense called witness Kathy Kruszewski, who testified that at about 3:05 on the afternoon of the murders, a man driving a dark car turned south from the street the Kubsch home was on onto another road in front of Kruszewski's car, driving fast and without slowing at the intersection. [2001Trial Tr. at 5021-23.]  Several days later, after learning about the murders, Kruszewski contacted the police about what she had seen, but the police did not further interview her after her initial report by telephone. [*Id*. at 5024-25.] Kruszewski's testimony indicated that speeding in the neighborhood was a common occurrence.  [*Id.* at 5026.] She did not know the make or model of the car, could only say that it was dark in color, and was unsure whether it had four doors. [*Id.* at 5028.]

Kubsch claims that this evidence somehow implicated Polachek in the murders.  But the problem is that Kubsch's briefing before me contains no citation to the post-conviction record to demonstrate what defense counsel might have done with the Polachek "tip" had they been told of it.  Because Mrs. Kruszewski's testimony was so nebulous and the information the prosecution received on Darin Polachek so sketchy, even the combination of the two does not yield anything close to a reasonable probability that, had the information about Polachek's two-tone car been disclosed to the defense, the result of Kubsch's murder trial would have been different.  The Indiana Supreme Court reached the same conclusion, and I see no erroneous or unreasonable application of federal constitutional precedent in its determination. *Kubsch* III, 934 N.E.2d at 1146.

Similarly, the information in Dvorak's letter concerning Brad Hardy's previous injury is minimal. The letter stated that sometime in the 1990's, Hardy had been in a "serious automobile accident and suffered head trauma," and that a civil suit later settled was premised in part on Hardy's claim of "diminished mental capacity" as a result of the accident. [PCR Appendix at 447.] Kubsch contends that this information was material as impeachment of Hardy's testimony. The information does not create a probability sufficient to undermine confidence in the outcome of Kubsch's trial.  This is because at trial Kubsch's defense team availed itself of several other means of impeaching Hardy's account of events, and because, even armed with the Dvorak letter, Kubsch has been unable to show little more than that Hardy's memory *of his earlier accident* was impaired. [PCR Transcript at 162-64.]  The assertion that Hardy had suffered an injury which "drastically impaired his memory" appears to be an unsupported exaggeration. [DE 16 at 24.]

Hardy's credibility was thoroughly attacked at trial as Kubsch acknowledges in his current briefing.  For instance, Hardy acknowledged the limitations of his memory. [DE 26 at 30.] He was also confronted with inconsistencies in his story. Hardy testified that Kubsch did not go in the house during their visit that day; but other evidence made it clear that Kubsch did in fact go inside the home because Kubsch had made a phone call from the residence during the same time frame.  *Id.*  In addition, Hardy's estimates of the times of various occurrences were inconsistent with his mother's.  *Id*. at 31.  The minimal additional evidence known to the prosecutor from Dvorak's letter is not shown to have added sufficient fuel to the impeachment fire to raise a reasonable probability of a different outcome in Kubsch's trial.

Here's how the Indiana Supreme Court viewed the issue:

> Regarding Hardy's head injury and alleged memory impairment, Kubsch provided no documentation or substantiation of the injury or any lasting effects from the accident that would have affected Hardy's testimony. Kubsch additionally failed to establish what impact any impairment to Hardy's memory would have had on the trial. Although trial counsel were apparently unaware of any injury affecting Hardy's memory, counsel vigorously cross-examined Hardy and impeached Hardy's memory. Hardy's mother corroborated the key points of Hardy's testimony, and no evidence has been presented to impeach her memory.

*Kubsch III*, 934 N.E.2d at 1146. The Indiana Supreme Court's analysis of the claim is not contrary to or an unreasonable application of *Brady* principles. Kubsch does not demonstrate that he is entitled to habeas relief on Claim III.

### Claim IV – Exclusion of the Prior Statement of Amanda Buck

Kubsch contends that his right to present a defense, as guaranteed by the Sixth and Fourteenth Amendments, was violated when the trial court prevented him from presenting to the jury a September 22, 1998 videotaped police interview with 9-year-old Amanda Buck, a neighbor and friend of murder victim Aaron Milewski. In the statement Amanda said that on the afternoon of the murders – September 18th – she had seen two of the victims, Aaron and his father Rick, at their house at approximately 3:30 in the afternoon. (Amanda Buck lived across the street.) If the jury believed Amanda's statement, and two of the victims were in fact still alive as of 3:30 pm, Kubsch could not have been responsible for the murders. This is because if Aaron and Rick did not arrive at Beth's house until after 3:30 pm, then Kubsch had an alibi. There was conclusive proof that he was already on his way to Michigan to pick up his son by that time.

Seven years later at the trial in 2005, the defense wanted to introduce Amanda's videotaped statement into evidence and here is how the issue played out: the then-15-year-old Amanda Buck testified that she didn't remember seeing Aaron the day of the murders, and later

that she "probably didn't see him" that day.  [Tr. at 2983, 2985.]  She testified that she didn't

even have a memory of being interviewed by the police on September 22, 1998. [Tr. at 2985. ]

Defense counsel wanted to ask her if she remembered telling Officer Reihl that she saw Aaron

on September 18th, 1998. [Tr. at 2988.] But the trial court sustained an objection and didn't allow

counsel to pose that question to Amanda, apparently finding that it was an improper attempt to

refresh her recollection.  [Tr. at 2989.]  Defense counsel posed no further questions to Amanda

Buck at that time.

Later, defense counsel again attempted to offer the videotape of Amanda Buck's

September 22, 1998 interview with the police as either a recorded recollection under Indiana

Evidence Rule 803(5) or as a prior inconsistent statement to Amanda's testimony at trial. [Tr. at

3010-11, 3019-20.]   While arguing over the admissibility of the videotape the prosecution

provided the court a recap of events subsequent to Amanda's initial police interview: several

days after the interview, Detective Reihl was contacted by Amanda's father, Lonnie Buck, with a

correction to Amanda's statement. What Amanda had earlier said about seeing the victims on the

day of the murders, actually occurred the day before; Amanda had simply been mistaken. [Tr. at

3012-13.]  Amanda's mother also confirmed that Amanda saw the victims the day before the

murders, not the day of the murders. [Tr. at 3013, 3027.]

The trial court concluded that because Amanda testified at trial that she had no

recollection of giving the statement – she was nine years old after all and it was seven years

earlier – the statement could not be introduced because it wasn't inconsistent with her trial

testimony. [Tr. at 3012, 3020.]  The trial judge observed that the videotape "doesn't aid the jury

in the disposition of this case unless the jury considers it substantive evidence." [Tr. at 3029-30.]

The judge explained that Buck's "credibility is not important when she says she remembers nothing.  She gave no substantive evidence in this case whatsoever." [Tr. at 3031- 32.]  As for the recorded recollection theory, the judge rejected that as well because he concluded that  Buck did not "make" the record, which instead was made by the police, and she hadn't "adopted" it. [Tr. at 3033.]

On direct appeal, the Indiana Supreme Court rejected Kubsch's evidentiary claims on both bases, and also the related federal constitutional claim under *Chambers v. Mississippi*, 410 U.S. 284, 302 (1973).  *Kubsch II*, 866 N.E.2d at 734-35.  As for recorded recollection, the court held that Buck's failure to remember the recorded interview prevented her from vouching for the accuracy of the recording, defeating the requirement that the recording be shown to reflect the witness's knowledge correctly.  *Id.* at 735.  As for prior inconsistent statement, the Indiana Supreme Court found that the trial court was within its wide discretion in determining that Amanda's testimony that she could not remember the September 22nd interview was not a positive statement and so did not provide the requisite degree of inconsistency with her statement to the police.  *Id*.

However, the court went on to note that at trial Buck also once offered testimony that she "probably didn't see [Aaron]" on the day in question.  Because that more substantive statement *is* contradicted by her September 22nd interview, the court concluded that Kubsch should have been allowed to impeach Buck on the matter.  *Id*.  The error was nonetheless found to be harmless because testimony from Amanda's parents (as proffered by the prosecutor) would have established that the sighting of Aaron and Rick had actually been the afternoon before the murders.  *Id*.  In view of the availability of this testimony, the Indiana Supreme Court determined

that Amanda's trial testimony did not likely contribute to Kubsch's conviction, and so it was not reversible error. *Id.*

In a footnote, the Indiana Supreme Court indicated that the availability of the parents' testimony also defeated Kubsch's federal constitutional claim that he was denied the right to present a defense. *Id.* at n.7. This statement is made without further explanation other than a supporting citation to *Chambers*, parenthetically noting that there the Supreme Court found a due process violation where rules of evidence were applied to exclude "evidence found to be trustworthy." *Id.*

Once again, because the Indiana Supreme Court dealt with the *Chambers* claim only in a footnote, it raises the question of whether the presumption that the federal claim was adjudicated on the merits should be rebutted thus allowing for *de novo* review of the issue. *Johnson v. Williams*, 133 S.Ct. at 1091. I don't believe that Kubsch has rebutted the presumption that the Indiana Supreme Court decided the *Chambers* issue on the merits just because the determination is relegated to a footnote. This is not a case where the court rejected the claim because of "sheer inadvertence." *Id.* at 1097. Rather, the Indiana Supreme Court plainly considered the *Chambers* issue but denied the claim because of the lack of trustworthiness of Amanda Buck's interview statement. *Kubsch II*, 866 N.E.2d at 735 n. 7. Although brief, the Indiana Supreme Court's treatment of the federal constitutional claim under *Chambers* expresses the court's consideration of the claim, the court's analysis of the holding of *Chambers*, and the court's rationale for rejecting Kubsch's claim. *Id.* Deference to this decision is thus appropriate under § 2254(d)(1).

As explored further below, *Chambers* stands for the proposition that, notwithstanding a correct application of state criminal trial rules and procedures, the exclusion of critical evidence

bearing "persuasive assurances of trustworthiness" may in particular circumstances deprive a defendant of a fair trial in violation of due process. *Chambers*, 410 U.S. at 302. The converse principle appears to have been invoked by the Indiana Supreme Court here: because Amanda Buck's videotaped statement concerning seeing Aaron and Rick *lacked* trustworthiness in view of the contrary statements of her parents, the exclusion of the evidence did not deprive Kubsch of due process.

The constitutional principle Kubsch invokes is explored in a series of U.S. Supreme Court opinions, including *Chambers*. Whether *Chambers* really was a one-off case of error correction or whether it stands for something much broader has been the subject of some debate by a fractured Supreme Court, *see Montana v. Egelhoff*, 518 U.S. 37 (1996), but more on that in a moment. First, the history.

In 1967, in *Washington v. Texas*, 388 U.S. 14 (1967), the Supreme Court found that the Sixth and Fourteenth Amendments were violated by a Texas law forbidding testimony for a criminal defendant by his co-actors in the same crime. Discussing the constitutional underpinnings of the claim, the Court wrote:

> The right to offer the testimony of witnesses, and to compel their attendance, if necessary, is in plain terms the right to present a defense, the right to present the defendant's version of the facts as well as the prosecution's to the jury so it may decide where the truth lies. Just as an accused has the right to confront the prosecution's witnesses for the purpose of challenging their testimony, he has the right to present his own witnesses to establish a defense. This right is a fundamental element of due process of law.

*Id*. at 19.

Six years later in *Chambers*, the Supreme Court found that, under certain facts and circumstances, the application of state evidentiary rules to exclude trustworthy evidence

31

important to the defense can deprive a defendant of a fair trial in violation of his right to due process. *Chambers*, 410 U.S. at 302.  Defendant Chambers called a witness and introduced the man's sworn out-of-court confession to the murder Chambers was being tried for. *Id*. at 291. After the prosecution elicited on cross-examination that the witness had repudiated the confession, Chambers was not permitted to challenge the renunciation of the confession with further examination of the witness, or by means of the testimony of three witnesses to whom the man had admitted the crime. *Id*.  The trial court's ruling was an application of Mississippi's rules of evidence. *Id*. at 294.

Reviewing the matter on direct appeal, the U.S. Supreme Court held that given the fundamental due process significance of the right to confront and cross-examine, "its denial or significant diminution calls into question the ultimate 'integrity of the fact-finding process' and requires that the competing interest be closely examined."  *Id*.  Examining the competing interests at issue as to the evidence in that case, the Court concluded that the importance of the right of confrontation exceeded the somewhat dubious value of the otherwise valid state rules of evidence.  Insisting that it was "establish[ing] no new principles of constitutional law," the court held that "under the facts and circumstances of this case the rulings of the trial court deprived Chambers of a fair trial."  *Id.* at 302-03.

In *Crane v. Kentucky*, 476 U.S. 683 (1986), the Supreme Court gave further support to the notion of a right to present a defense.  In *Crane* the defendant was prevented from putting on evidence suggesting that his confession was unreliable. The Court, relying in part on *Chambers*, held that this prevented the defendant from offering a defense to the charge and that the "exclusion of this kind of exculpatory evidence deprives a defendant of the basic right to have

32

the prosecutor's case encounter and 'survive the crucible of meaningful adversarial testing.'" *Id*. at 690-91 (quoting *United States v. Cronic*, 466 U.S. 648, 656 (1984)). Such exclusion deprived the defendant of a fair trial. *Id*. at 690.

Finally, as alluded to earlier, in *Montana v. Egelhoff*, 518 U.S. 37 (1996), the Supreme Court splintered into five separate opinions attempting to apply *Chambers* to a Montana statute disallowing voluntary intoxication to be considered as to *mens rea*. The plurality opinion by Justice Scalia reversed the Montana Supreme Court's opinion and reinstated Egelhoff's conviction, finding that the Montana statute's voluntary intoxication rule, and its application to Egelhoff, did not violate due process. The plurality referred to *Chambers* as "an exercise in highly case-specific error correction," and characterized *Crane* also as dealing with "the exclusion of certain evidence in that case" where the "sole rationale for the exclusion...was wrong." *Id*. at 52, 53.

Each of these Supreme Court cases presented a direct appeal rather than collateral review. In addition to the deferential standard of §2254(d) itself, the Supreme Court has clarified that "in §2254 proceedings a court must assess the prejudicial impact of constitutional error in a state-court criminal trial under the 'substantial and injurious effect' standard set forth in *Brecht*." *Fry v. Pliler*, 551 U.S. 112, 121 (2007) (referring to *Brecht v. Abrahamson*, 507 U.S. 619, 638 (1993)). Under the *Brecht* standard, an error is harmless unless it had substantial and injurious effect or influence in determining the jury's verdict. *Fry*, 551 U.S. at 116 (citing *Brecht*, 507 U.S. at 63 (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946))).

The Seventh Circuit has grappled on a number of occasions in § 2254 cases with the sticky intersection between state evidentiary rules on the one hand, and the principles of

*Chambers* on the other.  When presented with the issue in *Rice v. McCann*, 339 F.3d 546 (7th Cir. 2003), this is what the Seventh Circuit said:

> Before we decide the reasonableness of the Illinois Supreme Court's decision in this case, we note that we will not decide whether Pugh's suppression hearing testimony was in fact reliable enough to be admitted into evidence at Rice's trial.  Our doing so would usurp the role of the state courts in determining the admissibility of evidence at trial under state law, which we are not permitted to do under AEDPA. ... Instead, we may only consider whether it was unreasonable of the Illinois Supreme Court to hold, in light of *Chambers*, that the exclusion of Pugh's suppression hearing testimony did not violate Rice's due process right to present a defense and receive a fair trial.

*Id*. at 549.  The majority found that disagreement among the state courts on the evidentiary question at issue supported the finding that the state supreme court's ultimate decision was not unreasonable, and had to be affirmed on habeas review in federal court.[4]

In another application of *Chambers* in a §2254 context, the Seventh Circuit clearly framed the federal court's limited review:  "So the only question for us is whether the exclusion of evidence was not just wrong, but whether it was unreasonable to say that it did not violate [the petitioner's] due process right to present a defense."  *Morgan v. Krenke*, 232 F.3d 562, 567 (7th Cir. 2000).  The Seventh Circuit gave complete deference to the state appellate court's determination that the evidence was properly excluded under state law: the "state court of appeals said it was not [error].  That is the end of the matter of possible error based on the measuring of the evidence against state law because state, not federal, courts decide these things."  *Id.*  Then the court went on to say this:

---

[4]  The dissenting judge was less reluctant to critique the state courts' application of their own state evidentiary rules.  Finding that the exclusion of reliable evidence essential to the defense was based "on an irrational ground," the dissenting judge concluded that "the state supreme court's application of *Chambers* was unreasonable and the error was not a harmless one," such that Rice was entitled to a new trial.  *Rice*, 339 F.3d at 552.

> With that detour into Wisconsin law (which is not really our business) out of the way, we finally arrive at what is our business. We must decide whether it is unreasonable, given what the Supreme Court has said, for the Wisconsin Court of Appeals to conclude that the exclusion of Morgan's evidence did not deprive her of her right to present a defense.

*Id.* at 569 (parenthetical in the original). The Seventh Circuit then concluded that it was not unreasonable. *Id.*

In Kubsch's view, Amanda's 1998 statement that she had seen Aaron and Rick Milewski across the street from her house between 3:30 and 3:45 p.m. on the day of the murders was critical in light of evidence that Kubsch was already on his way to Michigan by that time and thus couldn't be responsible for the murders if Amanda was to be believed. Kubsch doesn't address the admissibility of the excluded evidence under the applicable evidentiary rules. He instead argues that even if the trial court's ruling was correct under Indiana's rules of evidence, it violated his due process rights under *Chambers*.

The question thus is whether the Indiana Supreme Court's decision was either contrary to *Chambers* or involved an unreasonable application of *Chambers*. And if it was unreasonable, is any underlying constitutional error harmless under the *Brecht* standard – i.e., did it have a substantial and injurious effect on the jury's verdict?

The Indiana Supreme Court rejected the *Chambers* claim because it determined that contradictory "corrective" evidence from Amanda's parents negated the trustworthiness of the videotaped statement Amanda gave shortly after the murders. It is true that if Amanda had been able to testify at trial to having seen Aaron and Rick at 3:30 on the day of the murders, that testimony would have had obvious importance to the defense. But Amanda was unable to testify to those facts because she simply didn't remember it any longer. Moreover, she couldn't vouch

35

for the truth of the statement she had made years earlier.  And in any event, there would have

been contrary testimony from both of her parents to the effect that the 9-year-old Amanda was

mistaken; it was Thursday that she saw Aaron and Rick rather than Friday.

This makes the scenario distinguishable from *Chambers*, in which the excluded

testimony "bore persuasive assurances of trustworthiness" but was nonetheless excluded.

*Chambers*, 410 U.S. at 302.  *Crane*, too, speaks of the exclusion of "competent, reliable

evidence."  *Crane*, 476 U.S. at 690.  The statement of a 9-year-old child no longer supported by

her or any other witness is not readily described as competent and reliable. Given Amanda's

inability to vouch for the earlier statement at the time of trial, and the available contradictory

rebuttal evidence, I am not persuaded that Amanda's videotaped statement was shown to be

sufficiently reliable to support the invocation of *Chambers*.

An additional element of the *Chambers* analysis has recently been highlighted by the

Seventh Circuit, namely consideration of whether the exclusion of the evidence was arbitrary or

disproportionate to the evidentiary purpose advanced by the exclusion.  *Harris v. Thompson*, 698

F.3d 609, 626 (7th Cir. 2012).  This involves a balancing of the defendant's interest in the

evidence against "the state's legitimate interests in promoting 'fairness and reliability' in

criminal trials."  *Id*. at 634 (quoting *Crane*, 476 U.S. at 690). Reliability of evidence is one of the

legitimate interests underlying the hearsay rule and the rules on impeachment by prior

inconsistent statement.  Because Amanda Buck no longer vouched for the pivotal assertion of her

original statement, which had also been promptly corrected by her parents, I am not convinced

that the value of the videotaped statement to the defense "substantially outweighed the danger

36

that it would have injected inherently unreliable evidence into the trial." *Harris*, 698 F.3d at 638.

I cannot conclude that the Indiana Supreme Court's rejection of Kubsch's *Chambers* claim was unreasonable. And even assuming that the exclusion of Amanda's statement was constitutional error under the *Chambers* line of cases, Kubsch does not show that it was other than harmless under the *Brecht* standard. Among the factors to be considered, the most significant here are the relative weakness of the excluded testimony and the availability of contradictory evidence. *Delaware v. Van Arsdall*, 475 U.S. 673, 684 (1986). The excluded evidence was not live testimony subject to cross-examination, but a seven-year-old statement by a 9-year-old girl who no longer remembered making the statement. The evidence was therefore relatively weak, and it was made even weaker by the contradictory evidence of her own parents.

For all these reasons, Kubsch does not succeed in establishing a right to relief on Claim IV concerning the exclusion of the videotape of Amanda Buck.

**Claim V – Ineffective Assistance of Counsel**

In Claim V, Kubsch brings eleven allegations of ineffective assistance of counsel in violation of his rights under the Sixth Amendment. The governing standards were established in *Strickland v. Washington*, 466 U.S. 668 (1984): "a petitioner must show both that his counsel's performance fell below an objective standard of reasonableness under prevailing professional norms, and that the deficient performance prejudiced his defense." *Griffin v. Pierce*, 622 F.3d 831, 843 (7th Cir. 2010) (citing *Strickland*, 466 U.S. at 688-93). With respect to *Strickland's* prejudice component, a petitioner must show "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A

37

reasonable probability is a probability sufficient to undermine confidence in the outcome." 466 U.S. at 694.  In conducting the inquiry I need to look at counsel's performance as a whole rather than focus on a single mistake.  *Id.* at 690; *Ebert v. Gaetz*, 610 F.3d 404, 411 (7th Cir. 2010).

In addition, the "extra layer of deference" under §2254(d) after AEDPA makes a petitioner's "uphill slope...even steeper" on an ineffective assistance claim.  *Ebert*, 610 F.3d at 412.  "Under AEDPA, establishing that a state court's application of the *Strickland* standard was 'unreasonable' is a tall task, and 'only clear error in applying *Strickland* will support a writ of habeas corpus.'"  *McAfee v. Thurmer*, 589 F.3d 353, 356 (7th Cir. 2009) (quoting *Allen v. Chandler*, 555 F.3d 596, 600 (7th Cir. 2009)).

Kubsch has identified eleven separate instances which he claims show that his lawyers were ineffective.  I will take up each claim in the order in which Kubsch raised them in his briefing before me and then consider whether the cumulative error requires the granting of the writ.

### Claim V(A): Impeachment of Tasha Penn Norman

In December 1998, two months after the murders, a witness named Tashana Penn Norman reported first to Crime Stoppers and later told police that she had overheard a conversation at the Hacienda Restaurant, in which a man seated behind her said he had hurt a little boy but didn't believe he would be caught.  Norman testified at trial that a second man seated in the booth had addressed the first speaker as "Kubsch" and later as "Wayne."

Kubsch contends that his trial counsel failed to impeach Norman with three matters: (1) her conviction on a theft felony, (2) evidence that, several months before the murders, Norman

38

had falsely reported a rape, and (3) testimony from the police officer who had investigated the rape allegation as to Norman's reputation for untruthfulness.

Considering this claim on Kubsch's post-conviction appeal, the Indiana Supreme Court noted the many ways in which defense counsel challenged Norman's credibility: they got her to admit that she had called Crime Stoppers twice before and collected rewards for those tips; they cross-examined Norman about inconsistencies in her reports of the conversation in the restaurant; they questioned her ability to have heard and seen what she claimed; and they called five witnesses in an attempt to undermine Norman's credibility. *Kubsch III*, 934 N.E.2d at 1150-51. Noting its previous holding "that the method of impeaching witnesses is a tactical decision and a matter of trial strategy that does not amount to ineffective assistance," the Supreme Court concluded that the "post-conviction court's determination that trial counsel adequately impeached Norman's credibility is not clearly erroneous." *Id.* at 1151. This was not an unreasonable application of *Strickland*.

As for the evidence of Penn Norman's theft conviction, the failure to offer it appears to have been a reasonable strategic decision. As detailed in the opinion denying the PCR, the defense offered *five witnesses* at trial who thoroughly undermined Penn Norman's credibility. [DE 16-1 at 31-32.] Any more evidence could have been perceived as piling on. Andy Hendricks testified that he heard Norman say that she had lied in court about a conversation she overheard in the Hacienda restaurant, that she did so to get a large sum of money, and that she had called Crime Stoppers three or four other times. [Tr. at 2963-64.] Chris Nemeth, the former boyfriend who was with Norman in the Hacienda that night, testified that no one was in the booth behind them in the restaurant, that Norman never told him about overhearing any such

39

conversation and that she did not seem upset or nervous. [Tr. at 2993-95.]  The defense also presented evidence that Norman knew that Kubsch was a suspect in the murder, having heard about it from a man she worked for.  [Tr. at 3083.]  What's more, the Hacienda waiter testified that there were no patrons in the booth next to Norman's and that, contrary to Norman's testimony about being upset by what she'd overheard, Norman had not asked to move from the booth where she'd been seated.  [Tr. at 3179.]  Finally, another witness testified that Norman had admitted to lying in court in a murder trial and doing it to collect a $1,000 reward. [Tr. at 3216.]

To put it bluntly, whatever credibility Norman may have had entering the courtroom was entirely stripped from her by Kubsch's defense team. As the post-conviction court said: "if the testimony of the person [who] accompanied her to the restaurant, the staff who waited on her at the restaurant and the people to whom she admitted she lied were not sufficient to undermine Ms. Norman's credibility, [it] seems unlikely a prior theft conviction and a police officer's opinion based on an unrelated matter would have led the jury to disbelieve Ms. Norman." [DE 16-1 at 33.] One important strategic decision that a defense attorney must make is deciding when enough is enough when it comes to impeachment.  *See United States v. Kozinski*, 16 F.3d 795, 817 (7th Cir. 1994) (explaining that limits to otherwise extensive impeachment represent trial strategy and are afforded enormous deference); *Williams v. Chrans*, 894 F.2d 928, 935 (7th Cir. 1990).  In view of the thorough attack on Norman's credibility by the defense, I cannot conclude that the Indiana Supreme Court unreasonably applied *Strickland* under these circumstances.

As for the alleged false rape report made by Norman, defense counsel did attempt to impeach her with this but the trial court excluded it under Ind.R.Evid. 608(b). [Tr. at 2328-29.] The failure to pursue a line of testimony the trial court had already indicated it would not permit

40

was not deficient performance on the part of Kubsch's lawyer.  Kubsch argues that evidence of

the false rape report was admissible on the distinct theory of bias – that Norman had reason to

attempt to curry favor with the State by supporting the prosecution of Kubsch because she was

then at risk of prosecution based on her false report of rape.  The post-conviction court rejected

this theory as "speculative and without support in the record." [DE 16-1 at 32.]  By the time of

trial in 2005, bias based on a fear of prosecution for having made a false police report some

seven years earlier would have been hard for a jury to swallow; it is simply too attenuated.

 Finally, Kubsch argues that his lawyer should have called the police officer who took the

false rape report to testify to Norman's propensity to lie.  But as she testified at the PCR hearing,

the officer's only knowledge of Norman's "propensity for truthfulness was confined to her

investigation" of the rape report. [DE 16-1 at 32.] The trial court had already ruled that "the

police officer has to be able to say that she's acquainted with the person's reputation for truth

and voracity (sic) in the community, not based on one incident." [Tr. at 2328.]  The failure to

pursue a line of testimony the trial court had already (properly) indicated it would not permit was

not deficient performance.

 In sum, the defense did a thorough job of attacking Norman's story.  The cross-

examination challenged her account, questioned her motive for reporting the story to Crime

Stoppers, and highlighted her previous rewards for information given to law enforcement.  The

defense also offered witnesses who explained where Norman might have gotten information

about the murders at Kubsch's house, contradicted her account of the Hacienda incident, and

testified that she had admitted lying about it.  Kubsch fails to demonstrate that counsel's failure

to take additional measures constituted performance that fell below an objective standard of

reasonableness, or that such measures would have created a reasonable probability of a different outcome at his trial. The Indiana Supreme Court's rejection of this ineffective assistance claim – on the basis that it was permissible trial strategy – was not an erroneous or unreasonable application of the *Strickland* standards. *United States v. Lindsay*, 157 F.3d 532, 535-36 (7th Cir. 1998) (the strong *Strickland* presumption that counsel had good reasons for strategic decisions on which impeachment witnesses to call dooms ineffective assistance claim).

**Claim V(B): Testimony of Gina DiDonato**

At trial the prosecution called Dave Nichols, a friend of Wayne and Beth Kubsch. Nichols testified that on the night of the murders, he received a phone call from Kubsch at approximately 8:00 p.m., in which Kubsch told him that Rick and Aaron had been shot and stabbed, and that Beth was "gone," which Nichols construed to mean that Beth was dead. [Tr. at 2455-56.] The testimony was significant because as of 8:00 p.m. on September 18, even the police did not yet know that Rick and Aaron had been shot in addition to being stabbed, and they had not yet found Beth's body. Cross-examining Nichols, the defense raised questions about confusion between what Kubsch said during the September 18 phone call and what Nichols might have later heard from his girlfriend (by then wife) Gina DiDonato at some time after September 18, based on statements made in Gina's workplace, a restaurant frequented by police officers. [Tr. at 2463-64.]

In its case-in-chief, the defense called Nichols back to the stand. He then testified on direct examination that during the phone call the evening of September 18, Kubsch had told him that Beth was gone. [Tr. at 2920.] On cross-examination, he confirmed that he understood "gone" to mean that Beth was dead. [Tr. at 2923-24.] At a sidebar conference concerning

42

Nichols' testimony, defense counsel indicated that Nichols was expected to testify that during the September 18 telephone conversation Kubsch had *not* told him that Aaron and Rick were shot. [Tr. at 2912.] This significant amendment of his earlier testimony never occurred in Nichols' testimony before the jury, however.

In an effort to minimize Nichols' testimony, the defense called DiDonato as a witness. DiDonato worked at a restaurant which used off-duty police officers as security on weekends. One of these was a St. Joseph County officer named "Kevin" who worked at the county jail. [Tr. at 2927.] DiDonato testified that in January 1999, she heard from Kevin at work that in the county jail Kubsch was "bragging about shooting the son and the ex-husband in the mouth," and that she had passed that information on to her husband, Dave Nichols. [Tr. at 2930.] DiDonato testified that on the night of the murders, she answered the phone at home between 8:30 and 9:00 p.m., and it was Wayne Kubsch looking for her husband.   During the call, Kubsch told DiDonato that Beth was "gone" and that she was "dead." [Tr. at 2934.]

Kubsch now argues that counsel rendered ineffective assistance when they called DiDonato as a witness and intentionally elicited testimony indicating that while in jail, Kubsch bragged about murdering Rick and Aaron Milewski. In addition, Kubsch says his counsel failed to address the prejudicial impact of the testimony by offering evidence in their possession that the unwelcome substance of the testimony was in fact untrue – namely, that the jail officer named Kevin denied having made such a statement and instead told police he'd told Gina that he only knew what he read in the newspaper and that he'd heard that "Wayne had been bragging in a restaurant." [PCR Appendix at 457.] The Indiana Supreme Court disposed of the ineffective assistance claim this way:

43

> Regardless of whether DiDonato's testimony was accurate, the use of her testimony was a reasonable trial strategy. The State introduced evidence through Nichols that Kubsch had shared details of the murders unknown to anyone other than the killer at the time of the conversation. It was not unreasonable for counsel to try to convince the jury that Nichols may have heard this information several months later from a gossiping waitress. Furthermore by choosing not to call the jailer to impeach DiDonato's testimony that she heard a rumor at work, counsel avoided reinforcing Nichols' testimony that Kubsch was the source of the information before police discovered Beth's body or the gunshot wounds to Aaron and Rick.

*Kubsch III*, 934 N.E.2d at 1153.

It is certainly true that based on Nichols' testimony, the defense had to contend with the jury's potentially damning conclusion that at 8:00 p.m. on the night of the murders, Kubsch told Nichols things only the murderer would know. They chose to respond by attempting to offer "corrective" testimony from Nichols himself and from his wife (DiDonato) suggesting that Nichols might have been confused about what (and when) he had been told about the murders.

*Strickland*'s performance prong carries a strong presumption that counsel's conduct was reasonable and that the "challenged action might be considered sound trial strategy." *Strickland*, 466 U.S. at 689. Even so, not all strategies are created equal, and some are so poorly conceived that they fall beyond the wide range of reasonable professional performance. This appears to have been an example. To put DiDonato on the stand and have her testify that the defendant had confessed to the murders while being held in jail was, to say the least, ill-conceived. Even if I were inclined to give Kubsch's counsel the benefit of the doubt and presume that their intention was not to have DiDonato go quite that far (saying expressly what Kubsch was reported to have said), such a presumption would be defeated by defense counsel having told the trial judge he *did* mean to elicit the precise words she had heard. [Tr. at 2928-29.]

44

Because we are in the habeas context, my analysis must turn to the Indiana Supreme Court's reasoning. The Indiana Supreme Court concluded that: "It was not unreasonable for counsel to try to convince the jury that Nichols may have heard this information several months later from a gossiping waitress." *Kubsch III*, 934 N.E.2d at 1153. That statement is true as far as it goes, but it doesn't mean that *any* attempt at achieving that goal was reasonable. Counsel chose a risky course of having DiDonato testify about Kubsch's incriminating statements while in jail. This was done in an effort to plant the seed that Nichols may have learned the incriminating information from someone other than Kubsch. But counsel could have achieved the same aim by merely asking Nichols if he had later heard scuttlebutt from Gina, repeating things she'd heard at work, and whether he might have been confusing what he'd heard that night from Kubsch with what he heard much later from her. This approach would have avoided the unreasonable risk that counsel took instead. For defense counsel to call a witness in their own case-in-chief and to have that witness testify about an alleged confession the defendant made while in custody is ineffective under almost any circumstance. I therefore find that the Indiana Supreme Court's assessment of counsel's performance as it relates to DiDonato was an unreasonable application of the performance prong of *Strickland*.

But even though I believe the Indiana Supreme Court's conclusion about the performance prong of *Strickland* was unreasonable, Kubsch is not entitled to habeas corpus relief on his ineffective assistance claim unless he also meets the prejudice prong of the *Strickland* analysis. The State's cross-examination of DiDonato had her quickly repeat the damaging information, that Kubsch had reportedly bragged about the shootings while in jail. [Tr. at 2930-31.] But the entire cross-examination (12 lines of transcript) is so brief that it literally could not have taken

45

more than one minute.  The follow-up questions from the jury all concerned DiDonato's testimony about the phone call from Kubsch the night of the murders, and so disclosed no focus among the jurors on the report of Kubsch's jailhouse claim of responsibility.  The State made no reference to this portion of DiDonato's testimony in their closing arguments to the jury.  So although potentially explosive, the damaging testimony (all of two lines of direct testimony, briefly recapped in cross-examination) appears to have passed as no more than a blip on the radar.

The trial record in this case is voluminous.  The jury heard testimony from more than 65 witnesses spanning 14 days prior to deliberating on Kubsch's guilt.  The jury deliberated for a little more than four hours before finding Kubsch guilty. Against this backdrop, and with absolutely no later reference to the very brief testimony, it cannot reasonably be concluded that the testimony was a controlling factor in the jury's verdict.  Because Kubsch is unable to persuasively demonstrate the prejudice necessary to succeed on this claim of ineffective assistance of counsel, I will deny relief  based on his trial attorneys' handling of Gina DiDonato's testimony.

**Claim V(C): Evidence of Life Insurance Company Investigation**

Kubsch's next claim relates to how his lawyers responded to the State's evidence concerning the investigation of Kubsch's claim under Beth's life insurance policy.  The State's case established that in July of 1998 the Kubsches had taken out a new life insurance policy on Beth in the amount of $575,000, with Kubsch as the sole beneficiary.  [Tr. at 2555.]  Kubsch already had a policy on his own life with the same insurer, on which Beth was the beneficiary.  [Tr. at 2556.]  On October 9, 1998 – three weeks after the murder of his wife – Kubsch filed a

claim on the policy insuring Beth.  In response to a question submitted by the jury as to whether the claim on Beth's policy was paid, Sandra Brunkhorst, a representative of the insurer, testified that a settlement was reached, but that the money was paid out to someone other than Wayne Kubsch.  [Tr. at 2562, 2563.] The defense made no objection to these questions.

A subsequent witness, Harvey Shevchik, testified that an investigation was opened on Kubsch's claim because it came within the "contestable period," that is, it was based on a death that occurred within two years of the policy's issuance. [Tr. at 2565.]  The investigation included contact with "medical sources, hospitals, doctors, [Beth's] medical background, medical examiner, Coroner's Office, law enforcement agencies, employers, if any, and friends and neighbors, if any," as well as an interview with the claimant, Wayne Kubsch. [Tr. at 2566.]  An audio recording of the interview was played for the jury, and they were given a transcript to follow. [Tr. at 2571.]  Shevchik testified that when his investigation was completed, he submitted a report to the insurer for its use in determining whether or not to pay the claim. [Tr. at 2572.]  Shevchik did not testify as to any conclusions or recommendation he may have made.  A juror submitted a question, inquiring what Shevchik's conclusion was but the court declined to ask a question on that subject, telling them not to "read anything into that one way or the other." [Tr. at 2575].[5]

Kubsch acknowledges that on the issue of motive, facts "concerning the issuance of the policy and Kubsch's attempt to collect were relevant to the State's theory." [DE 16 at 41.]  But Kubsch complains that evidence of the insurance company's investigation and denial of

_____

[5]  Unfortunately, the question submitted by the juror was not read into the record so I am inferring what the question was based on an exchange that took place at the side bar conference. *See* Tr. 2574-75.

47

Kubsch's claim was not relevant, and prejudicially "suggested that an independent agency had

investigated the death, had access to information and witnesses that the jury did not, and

concluded that Kubsch was responsible for Beth's death."  *Id.*  Before me, Kubsch does not

specify and discuss the evidentiary bases on which defense counsel should have objected, but

nonetheless contends that there is a reasonable probability that an objection would have

precluded the evidence.  In the state post-conviction proceedings, Kubsch was more specific,

citing Indiana Rules of Evidence 401 and 704(b), as well as the case of *Sailors v. State*, 593

N.E.2d 202 (Ind.Ct.App. 1992).  The Indiana Supreme Court dealt with each of these three

evidentiary angles.

> Concerning relevance under Rule 401, the Indiana Supreme Court concluded that:

> All testimony regarding the insurance policy and Kubsch's claim thereon are (sic)
> probative of the State's theory that Kubsch murdered Beth in order to collect on her
> life insurance policy.  The testimony that a settlement was reached on the policy and
> that Kubsch was not paid completed the story of the insurance company's
> involvement.  Even if this particular evidence was not relevant, counsel's failure to
> object was not unduly prejudicial to Kubsch as no evidence was offered regarding
> who received the settlement or why the settlement was not paid to Kubsch.
> Furthermore no evidence was presented as to when the settlement was reached or
> whether Kubsch's first conviction in this case was relevant to settlement.

*Kubsch III*, 934 N.E.2d at 1147.  The Supreme Court appears to have concluded that the

evidence now objected to was sufficiently relevant to the insurance motive offered by the

prosecution to survive any objection under Rule 401 because it "completed the story of the

insurance company's involvement." *Id*. This would defeat the performance prong of the

*Strickland* test, because counsel's failure to make an unwarranted relevance objection would not

have been substandard performance.  The court also found the prejudice prong not to be met in

the absence of any damaging evidence indicating why someone other than Wayne Kubsch received the insurance proceeds. *Id.*

Ind.R.Evid. 704(b) prohibits witnesses from offering "opinions concerning intent, guilt, or innocence in a criminal case; the truth or falsity of allegations; whether a witness has testified truthfully; or legal conclusions." The Indiana Supreme Court correctly observed that an objection on this basis would not have been sustained concerning the policy pay-out because Ms. Brunkhorst "merely replied in the negative when asked the factual question of whether the settlement was paid to Kubsch." *Id.* at 1148. A similar analysis would have defeated a 704(b) objection to Mr. Shevchik's testimony about his investigation, because he offered no conclusions as to Kubsch's guilt or any other matter forbidden by the rule.

Finally, the Indiana Supreme Court explained that the holding of *Sailors* is distinguishable and would not have supported exclusion of the now-challenged evidence:

> In that case, the prosecutor told the jury that it was the second jury to consider the case after a grand jury had weighed the evidence and indicted the defendant. Here the jury was simply informed that a settlement was reached and Kubsch was not awarded any money. No reference was made to any other arbiter determining Kubsch's guilt, and no argument was made that minimized the jury's responsibility to determine the law and facts of the case.

*Id.* (citing *Sailors*, 593 N.E.2d at 206). The testimony indicated that the insurance company had paid money but not to Mr. Kubsch, and that an insurance investigation had taken place. Kubsch doesn't suggest that the prosecution argued or even insinuated that the insurance company had made a determination that Kubsch was complicit in Beth's death. There was no closing argument exhorting the jury to convict Kubsch "because other people thought he was guilty," as was the case in *Sailors*. *See* 593 N.E.2d at 207. Because an objection based on *Sailors* would have been meritless, counsel was not ineffective for failing to make it.

49

Attempting to underline the prejudicial inference on which his ineffective assistance claim is based, Kubsch outlines the trial testimony of the two insurance company witnesses in reverse chronological order, suggesting that the order of the evidence indicated that there was an insurance investigation into Beth's death, after which, and on the basis of which, the claim was paid, but not to Wayne Kubsch.  The evidence was not presented in that order or framed in that way.  Kubsch's argument tilts at windmills when it refers to testimony concerning "the results of" the insurance company's investigation, evidence of the "decision to deny Kubsch's claim" and suggesting that the insurance company concluded "that Kubsch was responsible for Beth's death." [DE 16 at 41.]  There was no such evidence.

Based on the very brief segment of the record from which Kubsch weaves them, the unwelcome inferences now invoked were not so obvious or so strong that trial counsel's failure to object was unreasonably poor performance.  Nor is there any reasonable probability that an objection to the question about the insurance pay-out and to the testimony that there was an investigation would have led to Kubsch's acquittal. For all these reasons, I am not persuaded that the Indiana Supreme Court's rejection of this ineffective assistance of counsel claim was contrary to or an unreasonable application of *Strickland* principles.  In fact, I agree with it.

**Claim V(D): Prosecutorial Misconduct**

Kubsch contends that his trial counsel rendered ineffective assistance when they failed to object to prosecutorial misconduct during closing argument in the guilt phase.  Two instances are invoked.  In the first, Kubsch argues that "the prosecutor impermissibly implied personal knowledge of inculpatory evidence outside the record." [DE 16 at 42.]  In the second scenario,

Kubsch says "the prosecutor demeaned and disparaged defense counsel within the hearing of the jury and during closing argument." *Id.*

Kubsch contends that this claim of ineffective assistance was raised on post-conviction review but was not addressed by the Indiana Supreme Court. [DE 16 at 42.] In contrast, the State suggests that the arguments are procedurally defaulted because Kubsch did not fairly present them as ineffective assistance claims on his appeal from post-conviction review. [DE 22 at 40.] Instead, according to the State, Kubsch "simply told the Indiana Supreme Court to treat his waived claims of prosecutorial misconduct as claims of ineffective assistance of counsel." *Id.* Review of Kubsch's appellate brief discloses that in his "Argument 3," Kubsch argued numerous claims of prosecutorial misconduct at length, including the same two claims that underlie the present ineffective assistance of counsel claims. [DE 21-18, at 41-42, 34.] Thereafter in "Argument 4," Kubsch proffered 11 species of ineffective assistance of counsel (one with sub-parts). *Id.* at 61-103. The tenth of these was trial counsel's failure to object to instances of prosecutorial misconduct. *Id.* at 95. Because of the lengthy treatment earlier of the underlying claims of prosecutorial misconduct, Kubsch's discussion of the associated ineffective assistance claims was brief. But the claims clearly were raised.

In its opinion, the Indiana Supreme Court enumerated and discussed all but two of the ineffective assistance claims addressed in Kubsch's brief. *Kubsch III*, 934 N.E.2d at 1146-47. One of the claims omitted was the claim relating to counsel's failure to object to the alleged prosecutorial misconduct. However, the post-conviction court did address the claims and rejected them finding that "Kubsch failed to establish any instances of prosecutorial misconduct

which would have place (sic) Kubsch in grave peril" so that "trial counsel was not deficient in performance nor was Kubsch prejudiced." [DE 16-1 at 26.]

I am not persuaded that Kubsch failed to fairly present the claims now before me.  So I reject the State's assertion of procedural default.   But the question is, when the Indiana Supreme Court fails to address an issue raised by the parties, what standard governs my review? Is it the deferential standard of § 2254(d) or the more general standard of § 2243 where issues must be decided as "law and justice require?'

As discussed above, in 2011, the United States Supreme Court held that "[w]hen a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary."  *Richter*, 131 S.Ct. at 784-85.  Underscoring the principle, the court said it "now holds and reconfirms that §2254(d) does not require a state court to give reasons before its decision can be deemed to have been 'adjudicated on the merits.'" *Id*. at 785.  But the Seventh Circuit has previously held that "[w]hen a state court is silent with respect to a habeas corpus petitioner's claim, that claim has not been 'adjudicated on the merits' for purposes  of §2254(d)."  *Canaan v. McBride*, 395 F.3d 376, 382 (7th Cir. 2005).

In a previous capital habeas matter, I considered how *Canaan* can be reconciled with *Richter* and concluded that *Canaan* "simply stands for the unsurprising proposition that when *no* state court decides an issue, there isn't an adjudication on the merits under §2254(d), and thus §2243 governs instead."  *Overstreet v. Superintendent,* 2011 WL 836800, *5 (N.D.Ind. Mar. 4, 2011).  Here, as in *Overstreet*, there is a state post-conviction court decision on the merits of the

claim.  So applying *Richter*, I consider the Indiana courts' rejection of this ineffective assistance claim under the §2254(d) standard.

But under either standard, § 2243 or § 2254(d), I would find that Kubsch does not demonstrate an entitlement to habeas corpus relief, because I agree with the state post-conviction court that the assertions of prosecutorial misconduct on which the ineffective assistance claims depend are themselves so weak that they support neither the deficient performance prong nor the prejudice prong of the *Strickland* analysis.

Here are the specifics of this claim of alleged ineffective assistance of counsel, all of which occurred during closing arguments.  The first instance, according to Kubsch, involved the prosecutor telling the jury in his rebuttal closing argument "that there was evidence of Kubsch's guilt that could not be presented due to evidence rules." [DE 16 at 42.]  This is a clever but ultimately unsuccessful interpretation of what actually occurred.

Near the end of Kubsch's closing argument, his counsel cited types of evidence *missing* from the State's case (a gun, prior physical abuse in the marriage, etc.). [Tr. at 3309-10.]  The State objected, reminding the judge at sidebar that the prosecution's evidence of gun ownership and physical abuse had been excluded from trial under Rule 404(b).  The court sustained the objection, finding the defense argument improper.  Minutes later, in his rebuttal argument the prosecutor said: "Mr. Skodinski talks about things we can't show you.  We have rules of evidence sometimes."  [Tr. at 3314.]  In its context, this comment is brief and obscure, and would not clearly have signified to the jury that the prosecutor was suggesting that the State possessed damning evidence that was excluded on the basis of technicalities of evidence.  The

prosecutor immediately went on to focus on "what we did show you" and directed the jury's attention to evidence before the jury which the State believed pointed to Kubsch's guilt.  *Id.*

Kubsch also cites the later portion of the prosecutor's rebuttal argument in which he said that "there also are rules about what we can do about seizing things." [Tr. at 3320.]  Defense counsel did in fact object to this comment. [Tr. at 3321.]  The ensuing sidebar discussion clarified that the remark was not a comment on evidence not before the jury or a prelude to such a comment, but merely in its context was an explanation of the preceding sentence about Kubsch returning to the police station to sign the consent to search his vehicle.  Counsel and judge all agreed the matter was resolved and that nothing improper had occurred.  *Id.*

There was no ineffective assistance of counsel for failure to object to these portions of the prosecutor's rebuttal argument.  In the one instance, Kubsch's counsel did in fact object, but there was no basis for objection, as the trial court (and even counsel) properly concluded.  In the other, even with the benefit of hindsight, it can't be said that a competent attorney would have objected to the prosecutor's passing and entirely generic reference to the exclusion of evidence under applicable rules. "Where defense counsel has 'invited' a response, a prosecutor's otherwise improper remarks will not warrant reversal of a conviction if they do nothing more than 'right the scale.'"  *Bartlett v. Battaglia*, 453 F.3d 796, 803 (7th Cir. 2006)(quoting *United States v. Young*, 470 U.S.1, 12-13 (1985)).  Kubsch's counsel had made objectionable reference to matters on which evidence had been excluded, and the prosecution responded by a passing reference to the impact of evidentiary rules on trial presentations.  Under these circumstances, there is not a reasonable probability that the challenged remarks resulted in Kubsch's conviction. No deficient performance is demonstrated, and no prejudice is shown.

The second sort of prosecutorial misconduct that Kubsch says went unchallenged by his trial counsel was "personal attacks on the integrity of the defense team." [DE 16 at 44.]  In a sidebar during defense counsel's closing argument, the prosecutor complained of "one of the most unethical arguments I have ever heard." [Tr. at 3310.]  Kubsch tries to argue away the fact that this exchange occurred *at sidebar* by suggesting it is likely that the jury could hear it, based on references elsewhere in the transcript to the need to keep voices down at sidebar to avoid being audible to the jury.  This is entirely speculative and unpersuasive; there can be no basis for an evidentiary objection to, or prejudice from, a matter that is not actually before the jury.

Next, Kubsch cites the opening of the State's rebuttal argument, in which the prosecutor said:

> The sad fact of the matter is, sometimes you can stand up here and say whatever you want to say, and hopefully it if (sic) throw enough garbage out there, it'll stick. Mr. Skodinski stands up in front of you, as an officer of the court, and says blood tested in the drain didn't turn out to be Wayne's.  Well, that wasn't what the evidence was, ladies and gentlemen.

[Tr. at 3314.]  The opening sentence, standing alone, is clearly a general disparagement of the defense's closing argument and an exhortation not to believe it.  But the very next sentence makes the general comment specific, by addressing a particular matter on which the State contended there was an inaccurate recap of certain evidence by defense counsel in his closing.  Closing arguments are not always gentle and the "throwing garbage" remark comes close to an *ad hominem* attack.  But in substance, and in context, the remark merely argued (as counsel often must) that on a particular point the opposition was misconstruing the evidence.  The "garbage" remark was not so abusive, so shocking, or so inappropriate that any reasonably competent attorney would have objected to it.  Nor was it so powerful or persuasive that it is reasonably

probable that the statement – or the failure to object to it – resulted in Kubsch's conviction of the three murders.

Later in his closing, the prosecutor made some remarks about the work of private investigators, questioning the professionalism and value of their work and the resulting evidence. [Tr. at 3315.]  Kubsch points out that evidence about the private investigator that the prosecutor referred to was offered in the first trial, but not the second.  So it appears to have been a mistaken reference, possibly carried over from the prosecutor's notes from his closing argument in the first trial.  In addition to being brief, the remarks about "P.I.'s" are somewhat garbled and confusing.  If anything, the comments would merely have confused the jury as to what the prosecutor was even talking about, particularly if they had heard no evidence from or referring to the work of any private investigator.  In any event, the challenged portion of the argument hardly is readily understood to besmirch defense counsel, to warrant objection, or to have likely caused the conviction of Wayne Kubsch.

Tucked within this claim about trial counsel, Kubsch includes a challenge to his appellate counsel's failure to raise on direct appeal any claims about these alleged instances of prosecutorial misconduct. [DE 16 at 46.]  Because I find that the underlying claims of prosecutorial misconduct are without merit, I readily conclude also that there was no ineffective assistance by appellate counsel for failing to press the claims on appeal.  In the clear absence of any deficient performance by counsel or resulting prejudice to the defense, there is no right to relief under the *Strickland* standard on Kubsch's ineffective assistance claims concerning alleged prosecutorial misconduct.

**Claim V(E): Blood Experts**

Kubsch contends that his trial counsel failed to effectively cross-examine the State's experts regarding blood testing and failed to object to inaccuracies in the State's closing argument on the same subject.  An expert named Daun Powers testified for the State that "blood was indicated" in samples taken from the drains in the Kubsches' master bathroom, but that the samples yielded "an insufficient amount of DNA to further test." [Tr. at 1759].  Taken at face value, this testimony was somewhat misleading.  At the PCR hearing, Powers clarified her testimony by stating that the "presumptive testing" she had been able to perform on the drain samples was "not definitive or specific for identifying blood" and a positive result meant only that blood "could be" present in a sample. [PCR Tr. at 420-21.]

In support of his contention that his trial counsel was ineffective in his examination of Powers,  Kubsch now highlights the difference between "there was blood but not enough to test further" and "there may or may not have been any blood."  Kubsch also argues that, exacerbating that failure, his counsel referred to the substance as "blood" when cross-examining another witness and in closing argument, and failed to object when the prosecution did likewise.

The State suggests in its response brief that "[t]he record shows that neither the State nor Kubsch's trial lawyers understood that presumptive testing did not conclusively show a small quantity of actual blood." [DE 22 at 45.]  I am inclined to agree with that.  The question is the impact of that failure from a §2254 and constitutional perspective.

Daun Powers was a forensic DNA analyst employed with the Indiana State Police Laboratory. [Tr. at 1740.]  She testified that blood testing involves a series of tests:  "The first test is a presumptive test, to indicate whether or not blood may be present.  We then do a

confirmatory test, if the presumptive test is the positive.  The confirmatory test will confirm the presence of blood." [Tr. at 1742.]  Later, asked specifically about testing water samples, Powers said: "I'm just removing a small portion of the water, doing our presumptive test on it, to indicate whether blood may be present or not....If blood is present, it will then be carried on to DNA testing." [Tr. at 1756.]  Testifying as to the results of the so-called "presumptive test" run on a number of water samples taken from the drains in the master bathroom, Powers repeatedly used the phrase "blood was indicated." [Tr. at 1759.]  It is entirely reasonable to have construed such testimony to mean that blood was present in the water samples, and not merely that it was *possible* that blood was present.

Here's what was said in closing argument on the subject.  Attempting to highlight the State's lack of forensic evidence, defense counsel said "they tested various drains and found some blood in the drains, and they tested the blood, and it didn't match Wayne's." [Tr. at 3286-87.]  In rebuttal, the prosecutor said:

> Mr. Skodinski stands up in front of you, as an officer of the Court, and says blood tested in the drain didn't turn out to be Wayne's.  Well, that wasn't what the evidence was, ladies and gentlemen.  The evidence was that there was blood in the drains, but there was an insufficient quantity for DNA testing.  So we couldn't tell.  And we don't believe that the blood in the drains was Wayne's anyway.  It was the blood he washed off.  That was Beth, Rick and Aaron's, whatever he got on him.

[Tr. at 3314.]  At the end of the State's heavily timeline-based closing argument, the prosecutor offered a synopsis of events suggesting that Kubsch had time to shower after the murders, but did so without specific reference to forensic analysis of the drain water. [Tr. at 3323.]

As noted above, at the PCR hearing, forensic DNA analyst Powers testified again.  This time she was much clearer:  "I did presumptive testing for blood, which was called phenol

saline...It's a screening test to determine whether or not blood could be present in a sample...It's not definitive or specific for identifying blood." [PCR Tr. at 420-21.]  Powers further clarified:

> Q.      So just because you get a positive result on the presumptive test, that doesn't mean that it's necessarily blood?
> A.      Correct.

*Id.* at 421.  Powers then explained – much more clearly than she did at trial – that with each sink or drain sample, there was not enough sample to run the confirmatory test. *Id.* at 422-425.

The bottom line of all of this is that the jury was left with the mistaken impression that there was blood found in the drain when in fact there was not (or at least no confirmatory evidence of it).  When combined with the evidence that Kubsch may have showered at home, this evidence could have been seen as incriminating by the jury.

In the §2254 context, I am required to apply the highly deferential standard of §2254(d) and consider whether the Indiana Supreme Court's analysis was an unreasonable application of *Strickland* or other U.S. Supreme Court principles.  The Indiana Supreme Court found that Kubsch's counsel were not deficient for failing to highlight the inaccuracy or ambiguity in the trial testimony because doing so would have led to the type of explanatory testimony offered at the post-conviction hearing.  *Kubsch III*, 934 N.E.2d at 1154.  I'm inclined to disagree with this. Kubsch's trial counsel allowed Powers to give the impression that there was blood found in the drain when in fact that could not be confirmed.

But even if I were to find that the Indiana Supreme Court's decision was unreasonable under the performance prong of *Strickland*, I agree with their analysis of the prejudice prong. Here's what they had to say about it as it relates to the blood evidence:

> It is unlikely that testimony regarding the distinction between an indication of blood versus conclusive evidence of blood affected the outcome of the trial where forensic

59

> evidence was not the foundation of the State's case.  It was clear throughout all the proceedings that if blood was present in the shower drains, there was an insufficient amount to determine whether any blood present was human or belonged to any of the victims or Kubsch.

*Id.* at 1153-54.  Viewing the matter in its context within the entire trial record, I think the Indiana Supreme Court reasonably evaluated the significance of the evidence.  Whether or not Kubsch was found guilty of the three murders did not turn on this blood evidence which – even misunderstood – was not specific enough to point particularly to Kubsch.

To satisfy the prejudice prong of the *Strickland* standard, Kubsch has to show that but for counsel's failure to correct the misleading testimony, there is a reasonable probability that the jury would not have found him guilty.  On this point, I think the state post-conviction court put it best:

> It is unlikely that these small samples that were presumptively, but not conclusively, blood, altered the outcome of this trial.  The forensic testing was not the foundation of the State's case in chief.  The State focused on motive, Kubsch's contradictory statements, the duct tape, cell phone records and the time line.  As the cross-examination of Powers illustrates, the defense focused on the absence of DNA evidence linking Kubsch to the scene.

[DE 16-1 at 57.]  Given the volume of evidence and argument stretching over 14 days, and the relatively little emphasis placed on the disputed blood evidence by the prosecution, I cannot conclude that any such reasonable probability exists.

## Claim V(F) – Evidence about Kubsch's Relationship with Aaron

Kubsch challenges his trial counsel's failure to object to the State's 404(b) notice of evidence that Kubsch had threatened and abused Aaron.  Because Kubsch immediately acknowledges that "[n]o evidence of this nature was actually presented at trial," this claim, as stated, can't possibly meet the prejudice prong of *Strickland*.  The State makes the same point,

and cites to the Indiana Supreme Court's statement of that same analysis. *Kubsch III*, 934 N.E.2d at 1149.

But this claim goes on to address actual trial testimony from two witnesses about Kubsch hating Aaron, to which defense counsel made no objection. Beth's brother, Ryan Thompson, testified that Kubsch had once said that he "hated" Aaron. [Tr. at 2377.] And the Kubsches' neighbor Kathy Cruz testified that, after discovering the bodies of Aaron and Rick, Anthony (Beth's child from a previous marriage) said he knew "they" hated each other but "didn't know it would come to this." [Tr. at 1326.]

The State's theory was that Aaron and Rick were murdered because they were unexpected witnesses to Beth's murder. Given this theory of the prosecution, Kubsch contends that evidence of ill feeling toward Aaron was irrelevant and prejudicial. The Indiana Supreme Court found in effect that the irrelevance of the fleeting testimony supported the conclusion that there was no prejudice to the defense. *Kubsch III*, 934 N.E.2d at 1149. Because the prosecution's theory was that Aaron and Rick had "stumbled upon the crime scene at the wrong time," the court found that "it is unlikely any of the isolated references to a strained relationship between Kubsch and Aaron had any effect on the jury's determination." *Id.*

Deciding when to object to testimony is a matter of trial strategy. *Bergmann v. McCaughtry*, 65 F.3d 1372, 1380 (7th Cir. 1995); *United States v. Pedigo*, 12 F.3d 618, 623 (7th Cir. 1993). The testimony at issue here – the brief references to Kubsch "hating" Aaron – were not objected to, likely for strategic reasons. The testimony wasn't particularly relevant given the State's theory of prosecution, and trial counsel could well have determined that he did not want to highlight this fleeting testimony. As the Seventh Circuit has stated, "Counsel may have

61

wanted to avoid drawing attention to certain testimony, or may have wished to avoid irritating the jury." *Pedigo*, 12 F.3d at 623.

But even if one were to say that counsel was ineffective for failing to lodge those objections, in a trial in which more than 65 witnesses gave almost 2000 pages of testimony, these two lines of testimony cannot reasonably be thought to have made a difference in the trial's outcome. Viewing the matter against the entire trial record, I don't think Kubsch persuasively argues that the Indiana Supreme Court's prejudice analysis was unreasonable. This claim is therefore without merit.

**Claim V(G) -- Ski Masks**

Sgt. Thomas Cameron searched Kubsch's car two days after the murder. Cameron testified that a receipt from a K-Mart store was found in Kubsch's truck and the receipt reflected the purchase of two ski masks. *Kubsch III*, 934 N.E.2d at 1149. The receipt was mentioned during Sgt. Cameron's testimony as he was cataloguing what he found in the search of the vehicle. Concerning a white plastic K-Mart bag, Cameron said:

> And within it, I found the tags to two full-faced ski masks of a hunting style, that are camouflaged on one side, according to the picture.
> I never saw the items. But according to the tag, it would be camouflage on one side and orange on the other side, if you turn it inside out. But it would cover the entire face, except for the three holes for your nose and mouth and eyes.

[Tr. at 1620-21.] When asked, Cameron indicated that the police never recovered the masks themselves. [Tr. at 1621.] That's the sum total of the testimony concerning ski masks.

Kubsch argues that his counsel was ineffective for failing to argue that the testimony was irrelevant because the evidence didn't suggest ski masks were used in connection with the murders, and was prejudicial because the jury might have thought that the evidence "foreboded

the commission of another felonious crime, such as burglary or robbery." [DE 26 at 74.]  The

traverse reveals that this language comes from an Indiana Court of Appeals case in which the

admission of a ski mask was found to be prejudicial error at a trial on the charge of possession of

an unlicensed handgun – a very different scenario, in which the use of the ski mask in the offense

charged wasn't such a reasonable possibility.

As the Indiana Supreme Court noted when dealing with this claim, defense counsel did in

fact object to this evidence and testimony, both in the form of a motion to suppress the evidence

seized from the vehicle and by a continuing objection noted on the record at trial.  [Tr. at 1623.]

The court also separately considered whether a relevance objection should have been lodged:

> The overall theory of the State's case was that Kubsch first killed Beth in order to
> collect on her life insurance policies, and was surprised by Rick and Aaron's arrival
> and was forced to kill them, too... A subtext of the State's theory was that Kubsch
> carefully planned Beth's killing and did so with much stealth and cunning.  The ski
> mask evidence, although only marginally relevant for such purposes, tended to
> advance the State's theory of the case.  However, even assuming that such evidence
> was not relevant at all, Kubsch has not demonstrated prejudice.  The ski masks'
> receipt and tags were among over a hundred exhibits the State introduced at trial.
> The testimony concerning the ski masks consumed ten lines of a three thousand-plus
> page, fourteen-volume trial transcript.  Except as mentioned no other reference was
> made of the ski mask evidence during the trial itself or during opening statements or
> final summation.  Kubsch points to nothing in the record that suggests the jury gave
> any particular weight to this evidence.

*Kubsch III,* 934 N.E.2d at 1150.  Kubsch attempts in his traverse to argue that the Indiana

Supreme Court's analysis unreasonably underestimates both the prejudicial impact of the ski

mask evidence and its value as support of the State's larger circumstantial case.

I don't find any of this persuasive, and think the Indiana Supreme Court got it right.

First, the ski masks did have some marginal relevance to the State's theory that Kubsch carefully

planned the murder of his wife; perhaps a ski mask was used in the process, perhaps it wasn't.

63

That would have been for the jury to sort out.  Counsel was not ineffective for failing to object to relevant evidence.  And even if the ski mask evidence should not have been admitted, the passing references to that evidence during the trial were so fleeting it would be difficult to conclude that the Indiana Supreme Court's finding of a lack of prejudice was an unreasonable one under *Strickland*.

### Claim V(H) -- Failure to Admit Answering Machine Tape

Kubsch's next claim of ineffective assistance involves a convoluted explanation about evidence that wouldn't have been particularly important even if it had been admitted.  And defense counsel did attempt to admit it, but Kubsch says they didn't go about it the right way.

At trial the prosecution attempted to create a timeline of different people's movements, largely using telephone records to establish where people were at particular times.  This claim is about the tape from the answering machine at the Kubsches' home, which the defense says captured Beth's voice answering a call at what the machine recorded as 11:19 a.m. on the day of the murders (although Kubsch seems to acknowledge that the machine's "clock" was not entirely reliable – DE 26 at 78).  The significance of this would have been to show that Beth was home in time to leave her credit union transaction receipt (later found in Kubsch's car) for Kubsch to have picked up when he came home at lunchtime (as his testimony indicated he might have done).  [Tr. at 2700.]

On direct examination, Kubsch described going home mid-day. [Tr. at 2694.]  Defense counsel then sought to admit the tape from the answering machine with Beth's voice on it. But the State objected that a proper foundation hadn't been laid (arguing that Kubsch couldn't identify the tape and all the calls recorded when he wasn't home). [Tr. at 2697.]  Defense

counsel capitulated and withdrew the offer of the tape as evidence, saying "We don't have to. It's not that crucial." [Tr. at 2698.]  Kubsch went on to testify that, consistent with telephone records, he had placed a short call from the home phone at 11:37 am, that he had seen the credit union receipt next to the phone, and might have picked it up and taken it to his car. [Tr. at 2698-2700.]

The prosecution argued in closing that, given Beth's stops at the credit union and Consumer Credit Counseling Agency that morning, it made no sense for her to have run home in between, as would have been necessary for Kubsch's testimony about finding the receipt to be true. [Tr. at 3278-79.]  Besides the answering machine tape, the defense used other means to show that Beth had stopped at home between her two errands to the TCU and the CCC, such as testimony suggesting that she had the dog with her at one of the stops, but not the other.

At Kubsch's first trial, the parties reached a stipulation that a call answered by Beth was recorded on the Kubsch home phone sometime between 11:04 a.m. and 1:33 p.m. that did not appear on any telephone records admitted in the case.  Although this sounds like it goes only part of the way Kubsch wants to go (because it doesn't indicate precisely when the call occurred), Kubsch contends that his trial counsel should have again attempted to obtain such a stipulation or, failing that, should have laid a proper foundation for admission of the answering machine tape (as he says post-conviction counsel was able to do).

Like me, the Indiana Supreme Court was not all that impressed with the desired evidence: "As best we can discern, Kubsch contends through a series of inferences that the recording of Beth's telephone conversation supports the defense theory that Kubsch did not commit the murders." *Kubsch III*, 934 N.E.2d at 1151.  Of course Kubsch is dissatisfied with the Indiana

65

Supreme Court's resolution of the claim, and, although I am not, I agree that the analysis wasn't as thorough as it might have been. The court noted that at the post-conviction stage "[e]vidence was introduced that the answering machine's time stamp was inaccurate." *Id*. This suggests, although the court didn't say so, that the evidence might not have had quite the conclusiveness Kubsch would like, particularly as the phantom call did not appear on the telephone records admitted at trial. This supports not only a lack of prejudice, but also the determination that counsel's performance was not deficient in failing to fight harder for the admission of the tape. As defense counsel conceded at trial, the tape wasn't "that crucial."

Also on the performance prong, Kubsch doesn't do a persuasive job of demonstrating that the failure to admit the tape at trial was professionally incompetent. To try to demonstrate that a proper foundation could have been laid for the admission of the tape, Kubsch merely refers to the admission without objection of the police transcription of the contents of the tape that occurred at the post-conviction hearing. But of course, that involved a different piece of evidence, a different context, and admission without objection – all of which distinguishes the situation from defense counsel's at trial. Kubsch fails to show how the defense could have met the State's objection about foundation and authentication.

Finally, as the Indiana Supreme Court noted, "[a]s for failing to obtain a stipulation, Kubsch has not shown that if requested, the State would have agreed to such a stipulation. Indeed we find it highly unlikely given the State objected to the introduction of the tape." *Id*. And as I noted earlier, the stipulation entered into at the first trial didn't establish the time of the phone call precisely, or early enough in the day, to support all that Kubsch's reliance on it required.

This ground for relief is unsuccessful because Kubsch fails to show that his trial counsel's performance on this issue fell below objective standards of reasonableness, fails to show that absent their alleged failures the trial would've had a different outcome, and fails to show that the Indiana Supreme Court's rejection of the claim was an unreasonable application of *Strickland* principles.

## Claim V(I) – "Exculpatory" Evidence (Speeding Car & Nick Ratkay's Testimony)

This ground for relief relates to a subject discussed a couple times earlier in this opinion. At the first trial, Kubsch neighbor Kathy Kruszewski testified that at approximately 3:05 pm on the day of the murders, she nearly collided with a dark car speeding out of the neighborhood. [2001 Trial Tr. at 5021-24.] This evidence was not presented at Kubsch's second trial, and Kubsch contends it supported the defense theory that someone other than Kubsch committed the murders. More specifically, because Brad Hardy's counsel had once offered to the State the information that his friend Darin Polachek drove a dark colored car and had recently been at the Kubsch residence, Kubsch suggests that the evidence "supports the defense position that Hardy was the real killer." [DE 16 at 55.] How this implicates *Hardy* is entirely unclear to me. It was Polachek who owned the "dark colored" car – not Hardy.

In any event, I agree with the Indiana Supreme Court in how they analyzed Kruszewski's testimony:

> The evidence does not, as Kubsch contends, support the defense theory that someone other than Kubsch committed the murder. The description of the car and driver are vague at best, and the fact that speeding cars were not unusual in the neighborhood at the time makes this particular speeding car less significant. It is impossible to conclude that this evidence has any exculpatory value.

*Kubsch III*, 934 N.E.2d at 1152. This is not an unreasonable analysis of the speeding car evidence and trial counsel's failure to present it.

Kubsch is also critical of trial counsel's failure to discredit Brad Hardy's account of the day of the murders with the testimony of Nick Ratkay. Ratkay testified at the first trial that Hardy told him facts about the day of the murders that differed from Hardy's account to the police and to the jury. In particular, according to Ratkay, Hardy told him that he had not seen Beth inside the house that day, although he later testified that he did. [DE 16 at 55.]

Kubsch contends that the Indiana Supreme Court overlooked his Ratkay claim, so that §2254(d) deference does not apply. On the flipside, the State argues that Kubsch didn't properly present the Ratkay portion of this claim in his state post-conviction appeal, so that he has a procedural bar problem. Because the ground can be rejected on its merits, there's no need to wade into that dispute.

The decision whether to call a witness for impeachment purposes is purely a matter of trial strategy. *United States v. Lindsay*, 157 F.3d 532, 535-36 (7th Cir. 1998). The decision in this case was a sound one. For starters, Ratkay's testimony at the first trial mostly *supported* Hardy's own testimony, differing only as to some details. [2001Trial Tr. 4247, 4250]. For these reasons, defense counsel can't be said to have failed to perform reasonably when they didn't call Ratkay at the second trial to give his brief and insignificant testimony again. What's more, Hardy's credibility was seriously attacked during the trial. At best, Ratkay was just another impeachment witness. It is a quintessential strategy call for a trial lawyer to determine when enough is enough where impeachment is concerned. *United States v. Kozinski*, 16 F.3d 795, 817 (7th Cir. 1994).

68

**Claim V(J) -- Failure to Admit Amanda Buck's Videotaped Statement**

Kubsch next contends that his trial counsel were ineffective in their attempt to admit the videotape of Amanda Buck.  This claim is related to Kubsch's argument under *Chambers* (*supra* Claim IV) that he was denied his right to present a defense when he was prevented from presenting the videotape of then 9-year-old Amanda Buck's statement to the police, in which she said she had seen Rick and Aaron after school on the day of the murders.  As noted above, if accurate, this would have tended to exonerate Kubsch by placing the murders at a time when Kubsch was already on his way to Michigan to pick up his son.

From the ineffective assistance angle rather than the "substantive" ground in Claim IV, Kubsch has to show that counsel's performance was deficient.  That is difficult to accomplish since trial counsel did in fact attempt to admit the Buck videotape under two different theories: refreshing recollection and recorded recollection.   Counsel's effort were rejected by the trial judge so it's a little difficult to see how counsel was ineffective. What more could they have done?

As a refresher, here is how the issue arose at trial: Amanda Buck was called to the stand and said that she "probably didn't" see Aaron on the day of the murders.  The Indiana Supreme Court concluded that the trial court erred in rejecting use of the videotaped statement to impeach this bit of Amanda's testimony, but found the error harmless because other available testimony "would have supported hers had she been impeached, and therefore, her testimony likely did not contribute to the conviction."  *Kubsch II*, 866 N.E.2d at 735.  The "other available testimony" was from Amanda's parents who were prepared to testify that Amanda had been mistaken about

69

the day she had seen Aaron.  They would have said that she had seen him on Thursday, the day
before the murders, not Friday, the day of the murders.

Kubsch doesn't argue that his counsel was ineffective in failing to offer the videotape;
instead he says they were ineffective in *how* they offered it and the record they made.   In
particular, Kubsch argues that if his trial counsel had "competently investigated, they could have
shown that the prosecutor was overstating the impact either witness (Amanda's parents Lonnie
and Monica) would have had on impeaching Amanda's original version of what she saw." [DE
16 at 56.]   More specifically, Kubsch says:

> Had trial counsel investigated and presented [Officer] Riehl's testimony and
> [mother] Monica's statement of March of 2000, Amanda's statement would have
> been admitted as substantive evidence.  Even had [it] not been admitted at trial, trial
> counsel could have and should have made [a] reliable record for the Indiana Supreme
> Court to evaluate the trial court's ruling on direct review.  Counsel's failure to do so
> constitutes deficient performance under *Strickland*.

[DE 26 at 87.]

Recall that Riehl is the police officer who testified at the post-conviction hearing that
Amanda's father Lonnie told him shortly after Amanda's initial videotaped interview that
Amanda had been confusing the events of Thursday with Friday (the day of the murders). [PCR
Tr. 222-23.]  Kubsch fails to explain why Officer Riehl should have been called by his trial
counsel. Why would they have done such a thing?  Riehl would merely have confirmed that
Lonnie told him that his daughter Amanda had mixed up the days.  That would have undermined
Kubsch's claim, not enhanced it.  Kubsch fails to demonstrate deficient performance by trial
counsel with respect to any additional testimony from Officer Riehl.

Monica is Amanda's mother, who gave a statement in March 2000 to police officer Craig
Whitfield.  Like her husband Lonnie, she told the police that Amanda had confused Thursday

with Friday in her police interview.  According to Monica, Aaron had come to their house on

Thursday at 3:30 and stayed until 9:00 p.m.  [PCR Exh. 3.] Amanda had mistakenly believed it

to be Friday.  Kubsch now contends that if trial counsel had been ready with this evidence, it

could have been used to combat the State's arguments to the trial court that Amanda's

videotaped statement was unreliable.  Kubsch argues that Monica's later account of Aaron's visit

to the Bucks on Thursday afternoon and evening described something so different from

Amanda's videotaped statement about seeing Aaron after school at his own house that the

differences could not reasonably be understood to demonstrate misrecollection about the date, as

the prosecution suggested.

Even so, the persuasiveness of Monica's later information "correcting" Amanda's initial

statement was not the basis for the trial court's exclusion of the videotape.  The trial court's

rationales for rejecting the videotape as a prior inconsistent statement and as recorded

recollection, whether or not correct, would not have been affected by the argument Kubsch now

suggests trial counsel should have been prepared to make.  Whether or not Amanda's original

videotaped statement was correct did not enter into the Indiana courts' analysis until the Indiana

Supreme Court considered it in deciding that any evidentiary error was harmless and that there

was no due process violation because the excluded evidence did not have adequate assurances of

trustworthiness.  *Kubsch II,* 866 N.E.2d at 735.  Because Kubsch doesn't persuasively explain

what difference counsel could have made to the initial evidentiary determination by the trial

court, he fails to demonstrate both deficient performance and the impact on the trial's outcome

that are necessary for his ineffective assistance claim to succeed.

71

Perhaps because Kubsch recognizes that counsel is not accountable for the trial court's errors, he also argues that trial counsel was deficient for failing to make the optimal record for future appellate review.  It's not clear what the improved record would have been, and what counsel could have done to create it.  But as noted above, why in the world would defense counsel have offered evidence about Officer Riehl's conversation with Lonnie Buck, and Monica Buck's statement to Officer Whitfield, when the substance of their testimony would have been directly contrary to the very evidence – Amanda's videotaped statement – that they were seeking to admit?  Making such a record at trial for appeal purposes wouldn't have changed the trial evidence and so could not have created a reasonable probability that the jury would have acquitted Kubsch.  Even if trial counsel could reasonably be required to be so far-thinking as to make such a record for harmless error review on appeal, the failure to do so can't be said to have prejudiced the outcome of the *trial*.  Kubsch's argument about trial counsel's handling of the Amanda Buck videotape evidence fails to establish either unreasonable performance or prejudice to the defense, and no relief will be granted on this ground.

### Claim V(K) -- Cumulative Effect of Ineffective Assistance

Kubsch next invokes the notion of cumulative prejudice resulting from the compilation of all trial counsels' errors.  In *Strickland* itself, the Supreme Court's repeated references to "errors" in the plural when discussing the prejudice prong of the analysis suggests that cumulative error is properly considered, and that habeas corpus relief is not limited to situations in which a single error by counsel can be said to have resulted in the requisite degree of prejudice.  466 U.S. at 694.   The Seventh Circuit has also indicated that "prejudice may be based on the cumulative effect of multiple errors" and "[a]lthough a specific error, standing

alone, may be insufficient to undermine the court's confidence in the outcome, multiple errors together may be sufficient." *Hough v. Anderson*, 272 F.3d 878, 891 n.3 (7th Cir. 2001) (quoted in *Malone v. Walls*, 538 F.3d 744, 762 (7th Cir. 2008)). To demonstrate cumulative error, a petitioner has to show: (1) that there were a least two errors, and (2) that the effect of the errors together deprived the petitioner of a fundamentally fair trial. *United States v. Adams*, 628 F.3d 407, 419 (7th Cir. 2010); *Alvarez v. Boyd*, 225 F.3d 820, 825 (7th Cir. 2000).

With respect to two of Kubsch's claims of ineffective assistance of counsel, I have found that counsel failed to act with reasonable professional competence.  These involve trial counsel's use of Gina DiDonato's testimony, introducing the suggestion that Kubsch may have "bragged" in prison about shooting Rick and Aaron in the mouth, as well as counsel's failure, with respect to the forensic blood evidence, to figure out the difference between "blood was present" and "blood may have been present" in the bathroom drains.  I must now consider whether the effect of these errors together was sufficiently strong as to deprive Kubsch of a fundamentally fair trial.

The question is whether the impact of counsel's failures in these couple of respects undermine my confidence in the outcome of Kubsch's trial. Giving the question careful thought, I conclude that cumulative error does not warrant habeas relief.  The evidence supporting Kubsch's guilt vastly outweighed the impact of these insubstantial shortcomings of the defense.

The jury heard that Kubsch had amassed substantial debt and financial delinquency problems that could be readily addressed by the $575,000 in life insurance that he had recently procured on his wife.  They heard evidence suggesting that three days before the murders, Kubsch had bought the duct tape that was used to bind Beth.  The duct tape found on Beth had fibers on it from Kubsch's truck. Sunglasses that several witnesses identified with Kubsch were

found next to Beth's body.  Kubsch's friends Dave and Gina Nichols testified that Wayne told them Beth was dead before the police notified him that her body had even been found.  Wayne also told Dave Nichols that Rick and Aaron had been shot when that fact was not discovered until their autopsies a day later.  What's more, the house was locked on the day of the murders, there was no evidence of forced entry and only Kubsch and Beth had keys.  The night of the murders, Kubsch didn't offer police any information he had about his wife's whereabouts that day, and otherwise offered no input into any attempt to search for her though she was missing after two brutal murders had been discovered in their home with her car in the driveway.

Ultimately, the jury was unable to accept any interpretation of this evidence consistent with Kubsch's innocence, as his lies and attempts at obfuscation mounted.  Kubsch's explanations of what he did at lunchtime the day of the murders made little sense and changed as he discovered what the police were able to determine by other means of investigation.  Likewise, Kubsch first claimed to the police that he did not go home after work on the day of the murder.  Yet he changed his story only after discovering that the police could place him there via the cell phone tower records.  Putting all this evidence together left no reasonable doubt about Kubsch's guilt of the murders.

That result would not likely have been different but for the unprofessional errors by Kubsch's trial counsel.  The fleeting reference to the hearsay about Kubsch having incriminated himself by jailhouse "bragging" could not reasonably be thought to have had much impact on the jury's verdict.  Nor were the scales tipped against Kubsch by the misunderstanding about the significance of the blood evidence which, even misunderstood, was entirely nonspecific as to whose blood might have been present or how and when it got there.  Moreover, the relative

74

insignificance of these two areas of testimony is shown by the fact the prosecution never even touched on them in his closing argument.  In other words, it played very little role in the prosecution theory of the case. Separately or in combination, the evidence involved in these areas of deficient performance by Kubsch's counsel could not reasonably or realistically be thought to have carried the day for the prosecution, and so no right to relief is demonstrated on the claim of cumulative attorney error.

**Claim VI -- Counsel's Failure to Raise Kubsch's Competency to Waive Counsel**
             **at Penalty Stage**

Kubsch's Claim VI presents one additional ineffective assistance claim, this one concerning the penalty phase of the case.  Kubsch asserts that his counsel rendered ineffective assistance because they "failed to investigate his competency when Kubsch indicated that he intended to waive his right to counsel and forgo the presentation of mitigating evidence at the penalty stage of his trial." [DE 16 at 62.]  Kubsch's claim is that his trial counsel, though aware Kubsch suffered from "one or more mental disorders, including depression," failed to investigate or request a competency hearing, and that as a result there is a reasonable probability that the penalty phase occurred while Kubsch was incompetent. [DE 26 at 93.]

First a word about the standard of review now applicable to this claim.  In support of his petition, Kubsch acknowledges that the Indiana Supreme Court dealt with "this claim" on his post-conviction appeal, and denied relief on the grounds of prior adjudication. [DE 16 at 62.] In response, the State makes reference to the same *res judicata* determination by the Indiana Supreme Court.   Both Kubsch and the State argue the claim on the merits without any reference to §2254(d) deference.  In his traverse, Kubsch addresses the standard of review for the first time, arguing that the Indiana Supreme Court's ruling was not "on the merits" because the court

75

misconstrued the claim before it and did not address the substance of the ineffective assistance claim. [DE 26 at 93-94.] In any event, I will do as the parties have done and analyze the claim "head on," finding that the claim must be rejected even in the absence of any deference to the Indiana state courts' handling of it.

So the issue is whether counsel was ineffective for failing to raise Kubsch's competency prior to the penalty phase of trial.  But rather than actually assert that he was incompetent (or is incompetent now), Kubsch apparently would say that's the wrong question – "Where a defendant argues that he should have received a competency hearing, the focus of the prejudice inquiry is whether there is a reasonable probability the defendant **would have been found incompetent** had a hearing been held." [DE 26 at 96 (emphasis added).]  Kubsch argues that his depression and mood disorder, of which trial counsel were already aware, would have been shown to significantly impair his judgment and his ability to make complex decisions, and thereby to render him without the requisite degree of understanding of the proceedings.

In *Dusky v. United States*, 362 U.S. 402, 402 (1960), the Supreme Court said that the test for competency to stand trial "must be whether [a defendant] has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding and whether he has a rational as well as factual understanding of the proceedings against him."  In *Indiana v. Edwards*, 554 U.S. 164, 170 (2008), the Supreme Court quoted the *Dusky* standard and its recap in *Drope v. Missouri*, 420 U.S. 162, 171 (1975), defining a defendant's competency as "the capacity to understand the nature and object of the proceedings against him, to consult with counsel, and to assist in preparing his defense."  And in *Godinez v. Moran*, 509 U.S. 389, 391

76

(1993), the Supreme Court held that the competency standard for pleading guilty or waiving the right to counsel is no different and no higher than the competency standard for standing trial.

The competency formulation that Kubsch uses –"capable of making complex decisions"– appears to come from what the Ninth Circuit was using at the time of *Godinez.*  The Supreme Court reversed the Ninth Circuit in *Godinez*, although in doing so Justice Thomas says that any difference between the Ninth Circuit's standard and the *Dusky* "rational understanding" standard is not "readily apparent." *Id.*  This is a bit surprising, because being "capable of complex decisions" sounds like a higher level of function (of intelligence, even) than mere "rational understanding."  Kubsch's counsel may agree, and so they like to use that language because it sounds like it sets a higher threshold.

In any event, especially where Kubsch is not now asserting that he was in fact incompetent, I don't believe he has demonstrated that his trial counsel were ineffective for failing to raise the issue of his competency when Kubsch asserted that he wanted to proceed *pro se* for the penalty phase of trial.  Kubsch had advised counsel well before the trial even started that "he didn't want a penalty phase to occur, if he was found guilty in phase one.  So we knew that." [PCR Tr. 102.]  They had dealt with him closely for weeks during the course of the trial, were aware of how he was functioning, and perceived no changes in his mental state. [PCR Tr. 109.]

When Kubsch asserted his election to represent himself in the penalty stage, the trial judge, in the course of his *Faretta* colloquy, stated for the record:

> [I]n this case, that the Court observed Mr. Kubsch throughout trial, that during trial he pretty much constantly was able to confer with his attorneys, was able to confer with his factual investigator that had interviewed witnesses in this case, that he testified in this case, that the Court found his testimony to be coherent and relevant

77

to the facts of this case, and that the Court has no reason to doubt Mr. Kubsch's competency to represent himself in this matter.

[Tr. at 3340.]  I don't see any realistic probability that the trial judge would have at that juncture found Kubsch incompetent to continue to stand trial or to waive counsel, even if the proceedings were interrupted with a competency hearing at which the court heard the parade of experts adduced at the post-conviction hearing, who basically testified that Kubsch was depressed and somewhat fatalistic.  Unfortunately, the reality is that these are mental states entirely to be expected of one in Kubsch's circumstances.

In sum, Kubsch's trial counsel were not ineffective for failing to request a competency hearing prior to the sentencing phase of trial.   To ask for the proceeding to be interrupted so that a competency hearing could be had – all while the jury sat waiting in the wings – would have assuredly drawn the wrath of the trial judge.  Trial counsel were wise to not go down that pointless path. They were not ineffective, and so there is no basis for relief on Claim VI.

## Claim VII -- Knowing, Intelligent and Voluntary Waiver of Right to Counsel

In this variant of Claim VI, Kubsch argues that he did not make a knowing and voluntary waiver of his right to counsel at the penalty phase.  Here, Kubsch is critical of the trial court's *Faretta* inquiry for failing to adequately advise him of the consequences and pitfalls of representing himself and for not expressly discouraging the waiver of counsel.  This ground will be denied because the Indiana Supreme Court's decision on the claim was a reasonable application of the U.S. Supreme Court decisions on what the Constitution requires for waiver of counsel in *Godinez v. Moran*, 509 U.S. 389 (1993), *Faretta v. California*, 422 U.S. 806 (1975), and *Johnson v. Zerbst*, 304 U.S. 458 (1938).  The Indiana Supreme Court correctly identified and applied the U.S. Supreme Court holdings applicable to this claim, citing *Faretta* and *Johnson*,

78

and recognizing that the knowing and intelligent relinquishment of the right to counsel depends on the circumstances of the case and the background and experience of the defendant.

The issue was addressed on direct appeal and was thoroughly and reasonably considered. In the unique context of this case – after two murder trials and a previous penalty phase – the Indiana Supreme Court reviewed the trial court's *Faretta* inquiry, the entire record of the case, Kubsch's prior background and experience, and the particular context of the decision to waive representation, and reasonably concluded that Kubsch had knowingly and intelligently waived the benefits of counsel for purposes of the penalty phase, consistent with his decision not to put on mitigation evidence. *Kubsch II*, 866 N.E.2d at 735-38. Because the Indiana Supreme Court's careful and detailed treatment of this claim was not contrary to, nor an unreasonable application of governing United States Supreme Court authority, no relief can be granted on Claim VII.

## Conclusion

Wayne Kubsch has been tried twice for the murders of his wife, her son and her ex-husband. Both times he has been convicted and sentenced to death. The matter has been reviewed by the Indiana Supreme Court on direct and post-conviction appeal, and Kubsch has now presented his grounds for relief from the judgment and sentence under federal habeas corpus standards. Those standards bear in mind that even "given the myriad safeguards provided to assure a fair trial, and taking into account the reality of the human fallibility of the participants, there can be no such thing as an error-free, perfect trial, and...the Constitution does not guarantee such a trial." *United States v. Hasting*, 461 U.S. 499, 508-09 (1983). The threshold for habeas corpus relief is high – the petitioner must demonstrate that "the state court's ruling on the claim being presented in federal court was so lacking in justification that there was

79

an error...beyond any possibility for fairminded disagreement." *Harrison v. Richter*, 131 S.Ct. 770, 786-87 (2011). The Supreme Court has recently said that it "will not lightly conclude that a State's criminal justice system has experienced the 'extreme malfunctio[n]' for which federal habeas relief is the remedy." *Burt v. Titlow*, ___ U.S. ___ (Nov. 5, 2013) (slip op. at 6) (quoting *Richter*, 131 S.Ct. at 786).

I have given careful consideration to each of the claims Kubsch asserts for reversal of his conviction and a new trial or sentencing. I am convinced that Kubsch does not establish an entitlement to such relief, and that he has not shown that any constitutional error occurred in the proceedings that had a substantial and injurious influence in determining the jury's verdicts. *Brecht v. Abrahamson*, 507 U.S. 619, 638 (1993).

## Certificate of Appealability

"The district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." SECTION 2254 HABEAS RULE 11(a). "A certificate of appealability may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. §2253(c)(2). To obtain a certificate of appealability, Kubsch must show that reasonable jurists could debate whether his petition should have been resolved differently. *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003).

> A prisoner seeking a COA must prove something more than the absence of frivolity or the existence of mere good faith on his or her part. We do not require petitioner to prove, before the issuance of a COA, that some jurists would grant the petition for habeas corpus. Indeed, a claim can be debatable even though every jurist of reason might agree, after the COA has been granted and the case has received full consideration, that petitioner will not prevail. As we stated in *Slack* [*v. McDaniel*, 529 U.S. 473 (2000)], where a district court has rejected the constitutional claims on the merits, the showing required to satisfy §2253(c) is straightforward: The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong.

*Id.* at 338 (quotation marks and citations omitted).

Here, Kubsch has raised seven grounds in his habeas corpus petition. As explained below, I will grant a certificate of appealability as to Grounds II, IV, V and VII; I will deny a certificate of appealability as to Grounds I, III and VI.

Ground I – A COA will not issue on the Fifth Amendment claim in Ground I because the law is clear that a request for consent to search is not interrogation and because the facts are clear that Kubsch was not in custody at the time complained of.

Ground II – Because reasonable jurists could debate the existence and content of clearly established federal standards applicable to Kubsch's claim that prosecutor Michael Dvorak had a conflict of interest violating due process, a COA will issue as to this ground.

Ground III – A COA will not issue as to Kubsch's *Brady* claims, because no reasonable jurist could find the subject information to be material to the determination of Kubsch's guilt or his sentence.

Ground IV – I will grant a COA on this ground relating to the exclusion of Amanda Buck's prior statement.  The analysis of the evidentiary issues, the application of *Chambers* and the handling of both in a habeas corpus context provides many points of analysis open to debate among reasonable jurists.

Ground V – The eleven claims of ineffective assistance of counsel in Ground V involve various reasonably debatable issues of deficient performance, prejudice, and cumulative error so as to warrant the granting of a COA.

Ground VI – No COA will issue on Kubsch's claim concerning his trial counsel's handling of his waiver of counsel in the penalty phase.  His argument does not debatably support

81

a determination that counsel was deficient for failure to investigate or seek a hearing on

Kubsch's competency to waive counsel, or that Kubsch was prejudiced from the failure to do so.

Ground VII – I will grant a COA on Ground VII, believing that reasonable minds may

disagree concerning the Indiana Supreme Court's analysis of the sufficiency of the trial judge's

*Faretta* inquiry when Kubsch signaled his desire to waive counsel during the penalty stage.

**ACCORDINGLY:**

For the foregoing reasons, petitioner Wayne Kubsch's Petition for a Writ of Habeas

Corpus [DE 16] is **DENIED**.  The Clerk shall enter judgment accordingly.

**SO ORDERED**.

ENTERED: December 2, 2013.

        /s/ Philip P. Simon
        Philip Simon, Chief Judge
        United States District Court